# FEDERAL COMMUNICATIONS COMMISSION
## v. SCHREIBER ET AL.

No. 482.  Argued April 27, 1965.—Decided May 24, 1965.

*Assistant Attorney General Douglas* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Nathan Lewin, Sherman L. Cohn, Harvey L. Zuckman* and *Henry Geller.*

*Allen E. Susman* argued the cause for respondents. With him on the brief were *Jeffrey L. Nagin* and *Harry M. Plotkin.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

At issue in this case are the extent of the Federal Communications Commission's authority to promulgate procedural standards for determining whether testimony

taken and documents produced during an investigatory proceeding should be accorded confidential treatment, and the scope of judicial review of determinations made pursuant to such standards.

This case had its origin in a subpoena and various orders issued during the course of an investigatory proceeding conducted by the Federal Communications Commission pursuant to § 403 of the Communications Act of 1934, as amended, 48 Stat. 1094, 47 U. S. C. § 403 (1958 ed.).[1] The proceeding, financed by specific congressional appropriation,[2] was initiated on February 26, 1959, and had as its objective the gathering of

> "comprehensive information concerning the respective roles played by the networks, advertisers, agencies, talent, film producers and distributors, and other major elements in the television industry." [3]

---

[1] Section 403 provides:

"The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this Act, or concerning which any question may arise under any of the provisions of this Act, or relating to the enforcement of any of the provisions of this Act. The Commission shall have the same powers and authority to proceed with any inquiry instituted on its own motion as though it had been appealed to by complaint or petition under any of the provisions of this Act, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had, excepting orders for the payment of money."

[2] Independent Offices Appropriations Act, 1956, 69 Stat. 199, 201–202.

[3] Statement of Commission Chairman McConnaughey; Hearings before the Subcommittee of the Senate Appropriations Committee, Independent Offices Appropriations for 1956, 84th Cong., 1st Sess., p. 293. Chairman McConnaughey also noted that "[o]nly with this information can the problems affecting the further expansion of television outlets be adequately identified and evaluated, and appropriate recommendations made for their solution." *Id.*, at 294. See

As an initial step in the investigation, the Commission ordered that an

> "inquiry be made to determine the policies and practices pursued by the networks and others in the acquisition, ownership, production, distribution, selection, sale and licensing of programs for television exhibition, and the reasons and necessity in the public interest for said policies and practices . . . ." [4]

The Commission authorized its chief hearing examiner to conduct the investigation. He was empowered, *inter alia*, to subpoena witnesses, compel their attendance,

---

also Hearings before the Subcommittee of the House Appropriations Committee, Independent Offices Appropriations for 1956, 84th Cong., 1st Sess., pp. 663–664.

[4] The purpose and scope of the inquiry are set forth in the Commission's order of Feb. 26, 1959. 24 Fed. Reg. 1605. On Nov. 10, 1959, the Commission entered a supplemental order

"[t]hat the inquiry and investigatory proceeding instituted pursuant to the Commission's Order of February 26, 1959 (FCC 59–166), be and is hereby amended and enlarged to determine the policies, practices, mechanics and surveillance pursued and carried out by networks, station licensees and others in connection with the acquisition, ownership, production, distribution, selection, sale and licensing of programs for radio and television exhibition and the policies and practices pursued by networks, station licensees and others in connection with the selection, presentation and supervision of advertising material for broadcast to the public and the reasons and necessity in the public interest for said policies and practices . . . ." *Id.*, at 9275, 9276.

In its orders the Commission noted that the information sought was necessary (1) to complete its general investigation of radio and television broadcasting pursuant to the Independent Offices Appropriations Act; (2) to determine "what, if any, rules, regulations, legislation or other actions are necessary or desirable in the public interest in connection with" television programming; (3) to determine where the public interest lies in the granting of construction permits, station licenses, modifications and renewals; and (4) to enable the Commission to report and make specific recommendations to Congress in relation to the regulation of broadcasting. *Id.*, at 1605, 9275.

and require the production of any records or documents deemed relevant to the inquiry.[5]    The Commission ordered that

"said investigatory proceeding shall be a public proceeding except that the said presiding officer may order non-public sessions of the said investigatory proceeding where and to the extent that the public interest, the proper dispatch of the business of said proceeding, or the ends of justice will be served thereby." [6]

In October 1960, public sessions were held in Los Angeles, California, at which time evidence was received concerning the functions, policies and practices of television companies, talent agencies and representatives, program "packagers," [7] sales representatives, and others. On October 17, 1960, the Presiding Officer issued a subpoena *duces tecum* to respondent Schreiber, a Vice President of respondent Music Corporation of America, Inc. (MCA)—one of the largest packagers and producers of network television programs,[8] directing him to appear at

---

[5] *Id.,* at 1605.

[6] *Ibid.*

[7] "Packagers" develop and assemble the talent and scripts for a particular program or programs. A "producer" has general charge of the process of preparing the package for television showing.

[8] The Commission's unchallenged finding was:

"that MCA, Inc., (a) represents a large share of the talent, both acting and creative, engaged in television programming; (b) produces television programs; (c) packages and/or sells such programs; (d) maintains and leases production facilities for such programs and generally engages, on a large scale, in all facets of television program production. The record of the proceeding to date clearly establishes that failure fully to explore the policies, practices and activities of MCA, Inc., in connection with television programming would seriously impair, if not render nugatory, any attempt on the Commission's part to understand and delineate the policies, practices and activities involved in the creation, production, sale and licensing of television filmed programs . . . ." R. 16.

the hearing and to produce certain documents described in the annexes to the subpoena. Respondent Schreiber appeared and produced the material specified in Annex A.[9] He refused, however, to submit without qualification the material called for in Annex B,[10] which included a list of the programs packaged by MCA. Respondent Schreiber stated that he would produce the subpoenaed materials only "if the Commission will take this information and assure us that it will be held in confidence, will not be published, and will not be made available to other people, other than those on the Commission, and that serve the Commission." As grounds for confidential treatment, he asserted that the information sought might disclose trade secrets and confidential data, and that the information was outside the scope of the hearing. He

---

[9] "(A) A list by name or title of all television programs whether series programs, special programs, or otherwise, which appeared or were exhibited by or through the facilities of the television networks operated by NBC, CBS, or ABC since September 1, 1958, which programs were produced by MCA, Inc. or Revue Productions, Inc. and/or in which MCA, Inc. or Revue Productions, Inc. has or had a financial or proprietary interest or with regard to which MCA, Inc. or Revue Productions, Inc. is or was entitled to receive or has received a percentage of the profits or other compensation or fees in connection with the production or exhibition of such programs other than remuneration or compensation for the representation as agent of individual natural persons as talent."

[10] "(B) A list of all television programs whether series programs, special programs, or otherwise, which appeared on or were exhibited by or through the facilities of the television networks of NBC, CBS, or ABC, since September 1, 1958, in which MCA, Inc. or any predecessor affiliate or subsidiary of MCA, Inc. acted as packager and/or, by agreement or otherwise, is entitled to receive or has received a percentage of the cost or selling price of said program or was or is entitled to receive or has received other compensation, remuneration or fees in connection with the packaging, licensing for broadcast or selling of said program, otherwise than as remuneration or compensation for the representation as agent of individual natural persons as talent."

also objected generally to the procedures governing the hearing on the ground that they would require "public disclosure of trade secrets and confidential data of my company which might be of aid to its many competitors in this highly competitive television industry." The Presiding Officer found "no doubt" as to the relevance of the material and rejected, as "without merit," the claim that the information should be received in confidence.

Respondents then petitioned the Commission for review. On January 25, 1961, the Commission affirmed the Presiding Officer and ordered respondents to appear, testify and produce the material subpoenaed at a reconvened hearing. In its opinion the Commission stressed the importance of publicizing the information gathered during the course of the investigation [11] and reaffirmed its resolve to permit *in camera* sessions only in extraordinary situations:

> "[W]e determined that public proceedings should be the rule herein, and that non-public procedures should be used only in those extraordinary instances where disclosure would irreparably damage private, competitive interests and where such interests could be found by the Presiding Officer to outweigh the paramount interest of the public and the Commission in full public disclosure."

The Commission noted that the Presiding Officer and Commission counsel had made "every effort to avoid public disclosure of detailed internal financial information or detailed contractual arrangements which might in fact irreparably harm private interests without sufficient compensating benefit to the public," and found that they had not departed from this standard in rejecting respondents' claim of likely competitive harm which, the Commission held, was "totally unsupported by their pleadings and

---

[11] See *infra*, pp. 293–294.

contrary to the record." Accordingly, the Commission ordered respondents "to testify . . . regarding all matters deemed relevant by said Presiding Officer," and to produce the information required by the subpoena and "such other information and data as may be deemed relevant and ordered or directed to be produced by the said Presiding Officer." On remand, a broader claim for confidentiality was made by respondents. They requested that all testimony and documentary evidence to be elicited from them be received in nonpublic sessions, and disclosed only if a court, in subsequent litigation, should authorize its public disclosure. The contention was rejected by the Presiding Officer, but respondent Schreiber persisted in his refusal to comply with the subpoena and the Commission's orders.[12]

The Commission thereupon petitioned the United States District Court for the Southern District of California for the enforcement of its subpoena and orders. The District Court found that the investigation was statutorily authorized, that the information requested in Annex B was relevant to the inquiry, and that respondents had disobeyed valid orders and a valid subpoena.[13] Accordingly, the District Court ordered respondents to appear at a reconvened hearing and to comply with the Commission's subpoena and orders. However, the court, in order to protect "respondents' rights and to preclude disclosure of trade secrets of which competitors might

---

[12] On review of the Presiding Officer's first order, the Commission, although dealing with the merits of that order, held "that the orders and directions of the Presiding Officer as to relevance and public disclosure of evidence, information and data are interlocutory in nature, do not of themselves 'aggrieve' any person, and are not, as of right, appealable to the Commission." This holding precluded an application to the Commission for review of the Presiding Officer's second order.

[13] Respondents do not challenge these findings.

take advantage," ordered that all testimony given and documents produced by respondents be received and held in confidence.[14] The court's order further provided that, after the investigation of respondents had been completed, the Commission could move the court for an order, "should good cause exist therefor," permitting such testimony and documents to be made public. 201 F. Supp. 421.

On appeal, a divided Court of Appeals for the Ninth Circuit affirmed that portion of the District Court's order which pertains to the questions now before this Court.[15]

[14] Paragraph 2 of the District Court's order provides:

"It is Further Ordered that any further interrogation of respondents and any documents produced by respondents be taken and held by the Commission in private and confidential session, that the public be excluded therefrom, that all testimony adduced and documents produced be maintained in confidence by the Commission, that the Commission by motion duly made and served, may move the Court upon the conclusion of such interrogation and production for an order, should good cause exist therefor, permitting such testimony and documents to be made public, and that respondents shall retain the right to oppose such motion if and when so made."

[15] Under the procedures established by the Presiding Officer, counsel for a witness could not, during the course of interrogation of his client, take exception to, request clarification of, or object to any question, nor could he initiate consultation with his client. Counsel could consult with his client only upon the request of the client if approved by the Presiding Officer. The District Court held that under § 6 (a) of the Administrative Procedure Act, 60 Stat. 240, respondents were entitled to the assistance of counsel in the following respects: the right to have counsel object to any question and state his reasons therefor, and the right to have counsel initiate consultation without interference by the Commission or its agents. The Court of Appeals disagreed, concluding that the procedures established by the Presiding Officer were not violative of any constitutional or statutory provisions. On Sept. 2, 1964, the Commission amended Part I of its Rules and Regulations, permitting counsel for any person compelled to appear in Commission proceedings to advise his client either upon his own initiative or that of his client, "to make objections on the

The Court of Appeals held that the District Court had not abused its discretion in conditioning its order to require confidential treatment of the information sought. 329 F. 2d 517. In dissent, Judge Browning stated that the Commission's procedural rule, requiring public hearings unless *in camera* proceedings could be justified by those from whom the information was sought, was well within the Commission's power. It was Judge Browning's view that the District Court could require confidential treatment only if the Commission's application of its procedural rule and consequent refusal to accord confidential treatment were found to be arbitrary or an abuse of the Commission's discretion. *Id.,* at 528–534. Because this case presents important questions concerning the respective roles to be performed by federal courts and the Federal Communications Commission in the administration of the Communications Act of 1934, we granted certiorari. 379 U. S. 927.

We hold that the Commission's rule—requiring public disclosure except where the proponents of a request for confidential treatment have demonstrated that the public interest, proper dispatch of business, or the ends of justice would be served by nonpublic sessions—was well within the Commission's statutory authority. We further find that the Commission did not abuse its discretion in applying this rule. Accordingly, we modify the decision below insofar as it affirms the District Court's imposition of conditions upon the enforcement of the subpoena and orders issued by the Commission.

---

record, and to state briefly the basis for such objections." 29 Fed. Reg. 12774–12775. Finding this amendment to be "in accord with respondents' legal position on this matter," respondents did not seek review of the ruling below. Given the change in the Commission's rules, we need not, and do not, express any views as to the legality of the prior rules concerning a witness' right to the assistance of counsel.

## I.

Section 4 (j) of the Communications Act of 1934, as amended, 48 Stat. 1068, 47 U. S. C. § 154 (j) (1958 ed.), empowers the Federal Communications Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." This Court has interpreted that provision as "explicitly and by implication" delegating to the Commission power to resolve "subordinate questions of procedure . . . [such as] the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions." *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138. The statute does not merely confer power to promulgate rules generally applicable to all Commission proceedings, cf. *Federal Communications Comm'n* v. *WJR*, 337 U. S. 265, 282; it also delegates broad discretion to prescribe rules for specific investigations, cf. *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 321–322, and to make *ad hoc* procedural rulings in specific instances, *Federal Communications Comm'n* v. *Pottsville Broadcasting Co., supra.* Congress has "left largely to its judgment the determination of the manner of conducting its business which would most fairly and reasonably accommodate" the proper dispatch of its business and the ends of justice. *Federal Communications Comm'n* v. *WJR, supra.*[16]

---

[16] The Commission's own conception of its authority is similarly broad. Section 1.1 of the Commission's General Rules of Practice and Procedure provides that procedures to be followed in investigative proceedings shall "be such as in the opinion of the Commission will best serve the purposes of such proceeding." 47 CFR § 1.1 (1965).

In the *Pottsville Broadcasting* case, this Court stressed, in upholding this delegation of broad procedural authority, the established principle that administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." 309 U. S., at 143. This principle, which has been upheld in a variety of applications,[17] is an outgrowth of the congressional determination that administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved. Thus, underlying the broad delegation in § 4 (j) of procedural rule-making power to the Federal Communications Commission is a "recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." *Federal Communications Comm'n* v. *Pottsville Broadcasting Co., supra*, at 138.

To permit federal district courts to establish administrative procedures *de novo* would, of course, render nugatory Congress' effort to insure that administrative procedures be designed by those most familiar with the regulatory problems involved. Thus, in providing for judicial review of administrative procedural rule-making, Congress has not empowered district courts to substitute

---

[17] *Civil Aeronautics Board* v. *Hermann*, 353 U. S. 322; *Oklahoma Press Pub. Co.* v. *Walling*, 327 U. S. 186; *Wallace Corp.* v. *National Labor Relations Board*, 323 U. S. 248; *Endicott Johnson Corp.* v. *Perkins*, 317 U. S. 501; *Utah Fuel Co.* v. *National Bituminous Coal Comm'n*, 306 U. S. 56; *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294.

their judgment for that of the agency. Instead, it has limited judicial responsibility to insuring consistency with governing statutes and the demands of the Constitution. *Oklahoma Press Pub. Co. v. Walling,* 327 U. S. 186, 214–218; *Federal Communications Comm'n v. Pottsville Broadcasting Co., supra,* at 144–145; *Federal Radio Comm'n v. Nelson Bros. Co.,* 289 U. S. 266, 276–277.

It is apparent that the courts below did not respect this congressional distribution of authority. The Commission promulgated a rule governing disclosure in this investigation. Yet, neither the District Court nor the Court of Appeals inquired into the validity of the Commission's exercise of its rule-making authority. Instead, the District Court devised procedures to be followed by the Commission on the basis of the court's conception of how the public and private interests involved could best be served. In reviewing this determination, the Court of Appeals found that the District Judge had not abused *his discretion,* "but, on the contrary, established a fair and just procedure whereby a most important investigation could proceed without being unduly disrupted, obstructed or prolonged, and at the same time afford [respondents] protection against the improvident disclosure of possible valuable trade secrets." 329 F. 2d, at 524. In so doing, the Court of Appeals erred. The question for decision was whether the exercise of discretion *by the Commission* was within permissible limits, not whether the District Judge's substituted judgment was reasonable.

It is also evident that the Commission's procedural rule—requiring public proceedings except where it is shown that the public interest, the dispatch of business, or the ends of justice would be served by nonpublic sessions—was well within the Commission's power. Grants of agency authority comparable in scope to § 4 (j) have

been held to authorize public disclosure of information,[18] or receipt of data in confidence,[19] as the agency may determine to be proper upon a balancing of the public and private interests involved. That § 4 (j) is broad enough to empower the Commission to establish standards for determining whether to conduct an investigation publicly or in private is demonstrated by this Court's decision in *Norwegian Nitrogen Co. v. United States*, 288 U. S. 294. There, the Court pointed out that a similar grant of rulemaking authority—§ 315 (c) of the Tariff Act of 1922, 42 Stat. 941, 942–943—which authorizes the Tariff Commission "to adopt such reasonable procedure, rules, and regulations as it may deem necessary," empowered the Commission

> "to shape its course within reasonable limits by its own conception of the promptings of policy and fairness. It would have kept within the statute even though it had made the hearings private and had refrained from the publication of anything, either the records of its agents or the testimony of witnesses. . . . Instead, it made the hearing public, and exposed everything to view except only when publication was likely in its judgment to result in hardship or injustice." 288 U. S., at 321–322.

The delegated power, of course, may not be exercised arbitrarily, but its exercise may not be impeached merely because reasonable minds might differ on the wisdom thereof. *Oklahoma Press Pub. Co. v. Walling*, 327 U. S. 186, 215–218; *Isbrandtsen-Moller Co. v. United States*, 300 U. S. 139, 146; *Norwegian Nitrogen Co. v. United States, supra*, at 321–322. It is apparent, however, that

---

[18] *Isbrandtsen-Moller Co. v. United States*, 300 U. S. 139; *American Sumatra Tobacco Corp. v. Securities & Exchange Comm'n*, 71 App. D. C. 259, 110 F. 2d 117 (1940); *E. Griffiths Hughes, Inc. v. Federal Trade Comm'n*, 61 App. D. C. 386, 63 F. 2d 362 (1933).

[19] *Norwegian Nitrogen Co. v. United States, supra.*

the Commission's determination in the present case that "public proceedings should be the rule" with exceptions granted "only in those extraordinary instances where disclosure would irreparably damage private, competitive interests and where such interests could be found by the Presiding Officer to outweigh the paramount interest of the public and the Commission in full public disclosure" was not an arbitrary exercise of the Commission's authority. The procedural rule, establishing a presumption in favor of public proceedings, accords with the general policy favoring disclosure of administrative agency proceedings.[20] Moreover, the reasons advanced by the Commission in support of its determination to make public hearings the norm and to place the burden of justifying confidential treatment upon those from whom information is sought amply demonstrate that the Commission's exercise of its delegated powers may not be successfully attacked as arbitrary or capricious. The investigative inquiry was designed to secure information to aid the Commission in the discharge of its many functions. The Commission stated that the subject matter of the inquiry is "complex and generally unknown" involving "many-sided transaction[s]" among "networks, advertis-

---

[20] Section 3 (c) of the Administrative Procedure Act, 60 Stat. 238, 5 U. S. C. § 1002 (c) (1958 ed.), provides:

"Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found."

This statute has been interpreted to apply to all information received in any "formal proceeding." Attorney General's Manual on the Administrative Procedure Act 24 (1947). In construing § 3 (c), the District Court for the District of Columbia has stated: "Of course, the public interest in open hearings places the burden on the plaintiffs to show that their documents should be received in confidence." *Graber Mfg. Co.* v. *Dixon*, 223 F. Supp. 1020, 1022 (D. C. D. C. 1963). See also Davis, Administrative Law § 8.09 (1958).

ing agencies, program producers, program packagers, talent agencies" and others. Therefore, the Commission determined, in order "to obtain a full and rounded picture of such transactions, it is highly desirable that the facts, information, data and opinion supplied by one group or individual be known to other groups and individuals involved, so that they may verify, refute, explain, amplify or supplement the record from their own diverse points of view." The Commission observed that, in addition to stimulating the flow of information, public hearings serve to inform those segments of the public primarily affected by the agency's regulatory policies and those likely to be affected by subsequent administrative or legislative action of the factual basis for any action ultimately taken—a practical inducement to public acceptance of the results of the investigation.[21] Also implicit in the Commission's discourse is a recognition that publicity tends to stimulate the flow of information and public preferences which may significantly influence administrative and legislative views as to the necessity and character of prospective action. The Commission further pointed out that public disclosure is necessary to the execution of its duty under § 4 (k) of the Communications Act of 1934, as amended, 48 Stat. 1068, 47 U. S. C. § 154 (k) (1958 ed.), to make annual reports to Congress. Significantly, this investigation was specifically authorized by Congress so that Congress might "draw upon the facts which are obtained." [22]

We hold, therefore, that the Commission's adoption of the procedural rule favoring public disclosure and placing upon those from whom information is sought the burden of demonstrating the need for *in camera* proceedings is statutorily authorized.

---

[21] See generally Rourke, Law Enforcement Through Publicity, 24 U. Chi. L. Rev. 225 (1957); Note, 72 Yale L. J. 1227 (1963).

[22] Statement of Senator Magnuson, 101 Cong. Rec. 7629.

## II.

Remaining for determination is whether the Commission's application of its disclosure rule and the consequent rejection of respondents' requests for confidential treatment were so arbitrary or unreasonable as to warrant the imposition by the District Court of conditions upon enforcement of the Commission's subpoena and orders.[23]

Upon remand from the Commission, respondents moved that *all* testimony and documents to be elicited from them—not merely Annex B—should be received *in camera*. Respondents asserted that in light of the announced scope of the inquiry, the Commission's order to produce documents upon request and to testify "regarding all matters deemed relevant" would require MCA "to disclose all of its business information to its many competitors and to make a public record of all of its activities," and that such a disclosure, if demanded, would necessarily include confidential business secrets. No factual showing was made; there was only the argument.

The District Court accepted the argument, finding "well-grounded [the] fears of the respondents that the testimony to be given might result in disclosure of trade-secrets, of which competitors might take advantage." 201 F. Supp., at 425. Accordingly, the court ordered that all testimony and documents adduced by respondents be received in confidence. In so doing the District Court erred, for it is clear that the Presiding Officer did not abuse his discretion in rejecting this request for blanket nondisclosure.

The Presiding Officer did not know what information would actually be sought, what questions asked. Indeed, he could only speculate as to whether the Commission would seek to elicit any data which, if disclosed to MCA's

---

[23] Respondents do not contend that a denial of confidential treatment would result in the abridgment of any constitutional right.

competitors, would work competitive harm. He could not ascertain the likelihood of irreparable damage to private competitive interests, nor could he discern whether the private interest outweighed the public interest in disclosure. If and when information was demanded which if disclosed might in fact injure MCA competitively, there would be ample opportunity to request that it be received in confidence, and to seek judicial protection if the request were denied. Cf. *Reisman* v. *Caplin,* 375 U. S. 440. The Presiding Officer would have abused his discretion in denying the request only if it were shown that *no* information could have been elicited from respondents which could be publicly disclosed. The record affords no justification for such a proposition.

The only other possible basis for the District Court's order would be an assumption that the Presiding Officer would consistently require disclosure even if a balancing of public and private interests compelled secrecy. There is no support for such an assumption in the record and it runs contrary to the presumption to which administrative agencies are entitled—that they will act properly and according to law.

Nor can the District Court's order be saved on the ground that it did not direct that all information be held in confidence, but merely deferred the determination of whether the information was entitled to confidential treatment until after the inquiry of respondents had been completed. The order directs that there be no disclosure until the court so orders, "should good cause exist therefor." Not only does this order seem to shift the burden of proof to the Commission to justify publication, despite the valid rule to the contrary, but it also permits respondents to avoid submitting the issue of disclosure to the Presiding Officer despite the "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed

administrative remedy has been exhausted." *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51; *Reisman* v. *Caplin, supra.* Moreover, the District Court's order forbids disclosure until completion of the investigation of respondents without any showing that secrecy is justified. During this period the Commission could not make the information available to Congress, and the Commission would be denied the benefit of other evidence stimulated by disclosure. And the period during which the benefits of disclosure would be denied would inevitably be long. Respondent first appeared before the Presiding Officer on October 21, 1960, and resolution of the issues then raised has caused a delay of more than four and one-half years.

We do not find forceful respondents' contention that the District Court's order was necessary to protect against the discriminatory treatment of MCA by the Commission. The allegation finds little support in the record; moreover, no reference is made to this factor in the District Court's opinion or findings of fact. Respondents' assertions that "the Commission's interest in MCA was deep" and that "concentration upon MCA was unique," even if true, would not demonstrate the need for secrecy. Instead, such assertions merely lend credence to the Commission's unchallenged finding that because of the importance of MCA in the industry, the failure to explore fully the policies and practices of MCA "would seriously impair, if not render nugatory, any attempt on the Commission's part to understand and delineate the policies, practices and activities involved in the creation, production, sale and licensing of television filmed programs." Furthermore, it is clear that respondents are adequately protected against improvident disclosure, even if the Commission should unfairly seek disclosure of information which would be competitively disastrous to respondents. Not only does the administrative remedy exist, but judi-

cial protection against Commission overreaching also remains available with respect to any requests for information made in the future.

We conclude, therefore, that the Commission did not abuse its discretion in rejecting respondents' requests for blanket nondisclosure and accordingly hold that the District Court erred in ordering the Commission to afford confidential treatment to all information elicited from respondents.

Respondents also moved that confidential treatment be accorded Annex B which called for the production of a list of programs as to which MCA served as a "packager" and those in which MCA had a financial interest. Respondent Schreiber testified that the information sought would disclose MCA's confidential agency relationships with clients, "might be used detrimentally," and "would be possibly advantageous to our competitors."

We find that the Commission's affirmance of the Presiding Officer's determination that the material sought in Annex B should be received in public session was clearly proper. Certainly private agreements between MCA and its clients not to disclose facts without the client's consent could not affect the Commission in the discharge of its public duties. See 8 Wigmore, Evidence § 2286 (McNaughton rev. 1961). And the naked assertion of possible competitive injury does not establish that the Presiding Officer abused his discretion in declining to accord confidential treatment. Moreover, there is nothing in the District Court's opinion, findings or conclusions of law which indicates the likelihood, or even the possibility, of competitive harm from public disclosure of the Annex B information. MCA's competitors and others engaged in similar businesses had furnished publicly the same type of information without objection. Respondents did not attempt before the Commission or on review to distinguish the information furnished by MCA's competitors or the

list of programs produced by MCA (subpoenaed in Annex A) which was introduced without objection by respondent Schreiber. Nor did respondents file affidavits in support of their position. But, even if it were conceded that disclosure of Annex B might have some competitive impact, there is no warrant for concluding that the Presiding Officer abused his discretion in finding that respondents had not sustained their burden of demonstrating that the private interest involved outweighed the public interest in disclosure.

One further point should be discussed. During oral argument counsel for respondents suggested that his clients were prejudiced in their efforts to demonstrate the need for confidential treatment of the information contained in Annex B by restrictions imposed upon the participation of counsel by the then-prevailing Commission rules.[24] We do not find this contention persuasive. Respondents filed a petition, prepared and signed by counsel, seeking review before the full Commission of the Presiding Officer's rejection of their confidentiality request. Subsequently, they filed a second motion for confidential treatment with the Presiding Officer and respondents' counsel was afforded an opportunity to argue orally in support of the motion. Thus, it is evident that the then-existing Commission rules restricting the rights of counsel did not prejudice respondents in their efforts to secure *in camera* proceedings with regard to Annex B,[25] and hence

---

[24] See note 15, *supra*.

[25] It should also be noted that during the initial proceeding before the Presiding Officer when respondent Schreiber first objected to disclosure of the Annex B information, he was afforded an opportunity to consult with counsel. In addition, the Commission rules then in effect contained no restrictions on the right of counsel to prepare written documents in support of requests for confidential treatment or on the right of witnesses, such as respondent Schreiber, to submit such documents.

there is no occasion to order that respondents be afforded an additional opportunity to present objections to the disclosure of the information subpoenaed in Annex B.

The judgment of the Court of Appeals is modified so as to strike paragraph 2 of the District Court's order, and the cause is remanded to the District Court with directions to enforce the Commission's orders and subpoena without qualification.

*It is so ordered.*