The CITIES OF CANTON, CLEVELAND, and MASSILLON, Ohio, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Consolidated Gas Supply Corporation, Intervenor.

No. 19371.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 14, 1965.

Decided April 15, 1966.

Leventhal, Circuit Judge, dissented.

Mr. James L. Harkins, Jr., Cleveland, Ohio, for petitioners.

Mr. Joel Yohalem, Attorney, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, Howard E. Wahrenbrock, Solicitor, and Peter H. Schiff, Deputy Solicitor, Federal Power Commission, were on the brief, for respondent.

Mr. Norman A. Flaningam, Washington, D. C., with whom Messrs. Thomas F. Brosnan and Jacob Goldberg, Washington, D. C., were on the brief, for intervenor.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and LEVENTHAL, Circuit Judges.

WILBUR K. MILLER, Senior Circuit Judge:

On April 5, 1963, Hope Natural Gas Company applied to the Federal Power Commission for a certificate authorizing it to acquire by merger, and thereafter to operate, the natural gas facilities of its affiliate, New York State Natural Gas Corporation. Both companies were wholly-owned subsidiaries of Consolidated Natural Gas Company, a registered public utility holding company.[1]

Hope and New York Natural were remarkably similar: each had annual revenues of about one hundred million dollars; each produced natural gas, and also purchased it from others; each owned and operated pipelines and underground storage pools and each sold gas in interstate commerce. The real difference between the two companies lay in their geographic locations: Hope operated principally in West Virginia, and New York Natural in Pennsylvania and New York. Their pipelines were interconnected at the West Virginia-Pennsylvania line.

Hope proposed that after the merger (with its corporate name changed to Consolidated Gas Supply Corporation) it would make all sales and render all services theretofore made and performed by Hope and New York Natural. The sales contracts and tariffs of both companies would continue in effect in the name of the surviving corporation, the application said. No change in rates or services or physical operation was proposed.

At a prehearing conference September 24, 1964, before a Commission examiner, opposition to Hope's application was expressed by the Cities of Canton, Cleveland and Massillon, Ohio, for themselves and other ratepayers of East Ohio Gas Company (another wholly-owned subsidiary of the Consolidated system) which is the sole distributor of natural gas within their corporate limits, a part of which it had purchased from New York Natural prior to the merger. On October 6, 1964, a hearing was conducted by the examiner

---

1. The principal purposes of the merger were to simplify the corporate structure of the Consolidated system and achieve savings in administrative, operating and regulatory expenses which, it was estimated, would approximate $1,600,000 per annum in about three years.

and on November 18, 1964, he issued an initial decision which approved the proposed merger, with a proviso, however, to which we now refer.

The surviving corporation's adoption of New York Natural's tariffs presented no problem, except with respect to the latter's OSS rate schedule [2] which embodied a cost-of-service formula, a substantial element thereof being the cost of gas. Prior to the merger, New York Natural bought from 10 to 15 per cent of its storage gas from its affiliate, Hope. After the merger this purchase no longer took place because there was only one company. But the gas from the former Hope lines continued to flow into the former New York Natural's storage pools. Literal application of the OSS rate with the important element of the cost of gas absent from the formula would result in a bonanza to East Ohio and Peoples of about seven hundred thousand dollars per year.

To meet this problem, it was proposed that the surviving corporation employ an accounting procedure which (a) would separately price the gas stored in the former Hope and New York Natural pools, continuing the premerger practice, and (b) would use all the cost of gas purchased by Hope in Louisiana in calculating the weighted average cost of the gas acquired for injection in the former New York Natural pools as a substitute for Hope's former charges to New York Natural.

The examiner's initial decision regarded this proposed accounting method as a change in the OSS tariff which required use of the procedure set forth in Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, before it could become effective: a new filing by the surviving corporation, public notice thereof, and possible suspension and hearing, all subject to the Commission's order thereon. Accordingly he included the following paragraph in his order:

"(F) As a part of its new tariff volume Number 2, Hope-Consolidated Gas [the name the examiner gave to the surviving corporation] shall file, under and pursuant to Section 4 of the Natural Gas Act and the regulations thereunder, a sheet or sheets setting forth its program for storage accounting and pricing under the former New York State Natural OSS tariff, designed to be effective upon consummation of the merger herein referred to."

But the Commission rejected the examiner's paragraph (F) just quoted. It noted there was proof in the record that the proposal would maintain the preexisting level of charges under the OSS rate schedule and in fact would slightly reduce that level. In this connection the Commission's opinion said:

"* * * The proposed storage accounting was tested against actual operations in 1963, the last full calendar year for which figures were available, and was projected against the estimated operations in 1965, assuming the latter to be the first year of operations of the merged company. The results showed that the total effect of the proposed accounting procedure would be to decrease the charges to East Ohio and Peoples by $3,000 to $4,000 per annum, or a change of only 2/100 of one percent when compared to annual billings for gas under the OSS schedule exceeding $13,000,000 per year."

The Commission's opinion later said:

"We do not agree with the examiner that applicant must file its storage accounting proposal as a rate change under Section 4. The change giving rise to the necessity for the revised accounting procedure is to be a change in circumstance, namely, the corporate merger, and no 'change in rate' actually will be effected. Instead, the procedure will simply maintain the existing level of rates to the greatest possible degree. Moreover, the procedure will be employed only on an interim basis. Under these circumstances, the per-

---

**2.** Applicable only to New York Natural's sale of gas out of storage to two affiliates, East Ohio Gas Company and Peoples Natural Gas Company.

missive language of Section 4 does not necessitate the examiner's filing requirement.

"However, we do not give unconditional sanction to the costing procedure. Our determination to allow the procedure to be used is strongly influenced by the showing that only a negligible difference in charges will result during 1965. Whether this will hold true in subsequent years cannot now be determined. Accordingly, we shall limit our approval of the accounting procedure to a period of three years following the initiation of operations by the merged company. Following the submission of the actual operating figures for 1965 we will scrutinize carefully the rate structure and charges of the merged company. * * * "

The Commission further conditioned its approval of the accounting procedure (1) by imposing a 23-month moratorium on rate increase filing, (2) by requiring the maintenance of "suitable accounts and subaccounts to enable the isolation of costs chargeable to the former OSS System of New York Natural and to ascertain costs * * * in the same manner as is presently the case for each of the two companies," and (3) by specifying that approval of the new procedure

is "without prejudice to applicant or this Commission as to the treatment to be accorded storage costs in any future rate proceeding involving the merged corporation." [3]

Accordingly, the Commission entered an order February 2, 1965, by which it approved the merger, and also approved the accounting procedure proposed with respect to the OSS rate, subject to the conditions heretofore mentioned. Pursuant thereto, the merger became effective April 1, 1965. The petition for rehearing of the approval order filed by the Cities of Canton, Cleveland and Massillon having been denied, they petition for review as permitted by Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

The Cities list three questions which they say are presented by their petition for review. The first of these is thus stated:

"Does the Federal Power Commission have the authority to approve without any hearing a change in a rate schedule for natural gas that raised the charges to the Petitioners?" The petitioners state a question-begging query: it assumes that the Commission approved a change in a rate schedule which raised the charges to the petition-

---

**3.** The conditions were thus stated in the Commission's opinion:

" * * * Further, and in keeping both with the *ad hoc* nature of the procedure and its interim status, we conclude that the following additional limitations are required in the public interest as conditions to the issuance of the certificate herein: (1) a moratorium on all future rate increase filings by the merged company so as not to be effective after suspension prior to January 1, 1967, except as necessary to reflect increases in excess of $250,000 in purchased gas costs, any such increase to be offset by any rate reduction required to be made effective at or about the same time pursuant to any obligations remaining in Dockets Nos. G–5474, *et al.*, and RP64–40; (2) the cost-of-service filed by the surviving corporation with the Commission in any future rate proceeding shall reflect the annual savings in costs realized from the merger; (3) the maintenance of

suitable accounts and subaccounts to enable the isolation of costs chargeable to the former OSS System of New York Natural and to ascertain costs by zones and geographical areas in the same manner as is presently the case for each of the two companies, such data to be available for application in any future rate-making proceeding; and (4) that the accounting for the storage method as herein allowed shall be without prejudice to applicant or this Commission as to the treatment to be accorded storage costs in any future rate proceeding involving the merged corporation. These conditions, with the moratorium extended by one-half year, are in accord with a stipulation proposed by applicant on September 25, 1964. As so conditioned it is our opinion that the certificate for which application is made should be issued."
These conditions were embodied in Section (F) of its order.

ers, when the real question is whether the Commission has approved an increase in the OSS rate.[4] Petitioners' question should have been phrased as follows:

> In order to prevent an injustified reduction in charges which would have resulted from the mechanical application of the formula in a cost-of-service rate schedule, did the Commission err in adopting, on an interim basis, an accounting procedure which had the effect of maintaining the existing level of charges?

 The answer to this question is that the Commission did not err. Prior to the merger, in calculating the average cost of the gas withdrawn from storage, a significant part of such cost was determined by the charges New York Natural paid to Hope for gas received from Hope. As we have pointed out, Hope's sale to New York Natural ceased when the merger became effective, but the physical flow of the gas from the former Hope facilities into the Oakford and South Bend storage pools continues unchanged. Thus, although the formal sale has ceased, the costs for the volumes of gas flowing from the former Hope system continue to be incurred. As the Commission made clear:

> " * * * The problem is how to continue to reflect in the OSS cost-of-service form rate schedule the cost element comprising the per Mcf price now paid by New York Natural to Hope. Sales under the OSS schedule are made to East Ohio, supplying the Cities, and to Peoples Natural Gas Company. Without the utilization of some formula designed to record a gas purchase cost equal to the price now paid Hope by New York Natural, the storage input rate charged the former New York Natural pools would not reflect all the dollar effect of the costs presently included and, as a result, the charges under the OSS rate schedule

would drop significantly without any corresponding reduction in the costs to the combined companies."

Indeed, the petitioners accept the fact that, unless the proposed storage accounting formula were adopted, charges under the OSS rate schedule would decline by $700,000. Any such reduction, in the absence of any justifying reduction in the costs of rendering the OSS service, would be of course an unwarranted reduction amounting to a "windfall" to East Ohio, as the examiner recognized.

The Commission's approval of the accounting procedure proposed by Hope was based on its unchallenged finding that such procedure "will simply maintain the existing level of rates to the greatest possible degree." As we have said, the charges to East Ohio and Peoples have actually been slightly decreased. Yet the petitioners contend that, by approving the interim accounting, the Commission gave the surviving corporation an increase of $700,000 per year in the OSS rate. The contention is so obviously unsound that further discussion is unnecessary.

 Petitioners state a second question which they say is presented in this proceeding:

> "Is it just and reasonable both to authorize the merger of two natural gas companies in order to facilitate their achievement of joint cost savings of roughly $1,600,000 and to deny to their customers the benefits of such cost savings?"

This question erroneously assumes that the merger will result in an immediate annual saving of $1,600,000 by the surviving corporation, and that the Commission has denied the ratepayers the benefit thereof. The record shows without contradiction that the anticipated annual reduction in the operating costs of the surviving company will not be achieved until after three years. That being true,

---

4. The impropriety of their first "question presented" was acknowledged by the petitioners when they said in their brief:
 " * * * The only dispute seems to be as to whether there was any increase in rates and charges or whether there was a denial of a decrease."

it would have been an improvident act for the Commission to order an immediate reduction in rates commensurate with the savings anticipated three years later.

It is noted again, in this connection, that the Commission limited its approval of the accounting proposal to the first three years after the merger, and stated that "Following the submission of the actual operating figures for 1965 we will scrutinize carefully the rate structure and charges of the merged company." Moreover, the Commission conditioned its approval of the merger, as we have already shown, so as to prevent prejudice to its consideration of any future rate proceedings involving the surviving corporation. In the circumstances, the action of the Commission amply protected the ratepayers if the annual savings should occur as anticipated and if other costs should be constant so that a rate reduction might be justified at the end of the interim, and was fully justified. Cf. FCC v. Schreiber, 381 U.S. 279, 289–294, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

In the course of their argument the petitioners state:

"The Commission capriciously and arbitrarily denied the Petitioners any opportunity to prove the unreasonableness of the modifications in the OSS rate schedule which were proposed by Hope and ordered by the Commission."

To the contrary, petitioners were given ample opportunity to be heard on the proposed storage accounting procedure. Their counsel was allowed considerable latitude in cross-examining the witness who supported the new procedure and stated to the examiner that another hearing would be "an unnecessary duplication of effort." Near the conclusion of the hearing petitioners' counsel said:

" * * * [W]e will not introduce any additional evidence. We can rely upon the record as it is. * * * "

Thus the petitioners' charge that the Commission capriciously and arbitrarily denied them an opportunity to prove the unreasonableness of the proposed stor-age accounting procedure is without any foundation.

■ Finally, the petitioners state as a third question presented in this proceeding the following:

"The last question is whether the Federal Power Commission may shift the burden of proof from the applicant for an increase in charges to the opponent of said change?"

The petitioners did not raise this issue in their application to the Commission for rehearing, nor did they state any ground for their failure to do so. Consequently, the objection will not be considered by this court, because Section 19(b) of the Natural Gas Act provides:

" * * * No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. * * * "

It is well settled that, in obedience to this statutory provision, courts will not consider such questions. In any event, the question is inapposite here, as it is based on petitioners' claim that the storage accounting procedure approved by the Commission amounted to an increase in the OSS rate which required Section 4 procedure—a claim we have already discussed and rejected.

We have given careful consideration to all the contentions made by the petitioners, and have concluded that the Commission's order must be upheld.

It is so ordered.

LEVENTHAL, Circuit Judge (dissenting).

The skillful argument of the Commission's counsel focused on its having reached a fair and common sense result. Little enthusiasm can be mustered for the substantive conception of petitioners, that their supplier East Ohio Gas was entitled to a "windfall" reduction of $700,000 per annum in the amounts payable to its affiliates even in the absence of a change in cost, a reduction gained

through strict application of the wording of the cost of service tariff to an unanticipated situation. Yet I feel that petitioners do have a sound objection to the procedural course followed by the Commission. This objection remains even though petitioners do not now contest the general propriety of the Commission's approval, under § 7(c) of the Natural Gas Act, of the acquisition by intervenor Hope (now Consolidated Gas Supply Corporation) of the natural gas facilities of its affiliate, New York Natural.[1]

The proper procedure probably would not have yielded a different final result in the case at bar—but it might. In some future case the difference in procedure may loom larger. In any event, protection of consumers typically lies in diligent attention to procedural requirements, particularly those involving the burden of proof and presentation resting on utilities which seek a change in revenues.

1. The issue under discussion was injected at the hearing when Hope amended its application for approval of the merger to seek approval, at the same time, of what is referred to as a change in accounting procedure.[2]

Applicant's problem was that although it intended to maintain all existing dollars and cents tariffs of the merging companies, it did not wish to maintain New York Natural's tariff for sales to East Ohio as written. That tariff was based on New York Natural's "cost of service," a formula that included as one element "cost of gas." Whereas the cost of gas contemplated by the tariff was the cost of gas to New York Natural, buying from Hope at the Pennsylvania line, retention of the "cost of gas" provision as applied to the merged company would mean a substantially lower dollar level, reflecting Hope's purchases in fields throughout the nation prior to interstate transmission to the northeast.

Applicant understandably wished to be certain that it would not be assuming substantial non-recurring dollar expenses, in addition to non-monetary merger pains, only to face an immediate decline of $700,000 annually in its receipts. It devised a program whereby it would price the Hope gas moving into the New York Natural storage pool at the average prices paid by Hope in Louisiana. It happened that these prices as cost of gas yielded about the same amount of charges to East Ohio as the prices Hope charged on sales to New York Natural at the Pennsylvania border.

However ingenious applicant's proposal may have been as a short-cut calculation, it cannot fairly be characterized as a mere accounting change. There was no serious effort by any one to justify this as permissible under sound accounting principles. The Commission's Uniform System of Accounts provides that gas stored underground "shall be priced at the average cost of the gas constituting the common supply of the system," and that gas may be presumed to come from purchases from specific sources only when this presumption, consistently observed from year to year, is "in harmony with the over-all system operation of gas supply and utilization." (Balance Sheet Accounts, Account 117, Note B-1.)

1. The Commission found that the evidence established that an annual saving in excess of $1.5 million may justifiably be expected from the merger, due to savings of both companies in payroll and savings in New York Natural's office rental expense, after offset of certain costs of new offices and facilities. This, of course, outweighed a non-recurring expenditure of $941,887, incurred in connection with the merger.

2. This change had theretofore been proposed by Hope in a letter to the Commission dated June 12, 1964, which had not been sent to the parties. The Commission staff had apparently requested that this be submitted to the Commission for separate approval. Although this change in the application came after the notice of hearing and after the pre-hearing conference, petitioners agreed to the consideration of this request as part of the application for approval of transfer of facilities.

Applicant's proposal would accord with accounting principles if Hope's share of New York Natural's storage gas was entirely from Louisiana production, but the Examiner found there was no evidence of this.

Applicant's proposal might also be defended as some accounting short-hand if it could be shown that the prices paid in Louisiana were substantially equal to Hope's average field prices. But there is no evidence that this is the fact. Said the Examiner: "What is lacking is some analysis to show that the Hope gas— which actually comes from many sources —is truly and fairly priced by assigning to it the price which Hope pays to its Louisiana sources."

Indeed, unless I completely misunderstand the mathematics of the matter, Hope's field prices in Louisiana must be substantially higher than Hope's average field prices. Otherwise they could hardly yield the same charges as those now obtained from New York Natural at the Pennsylvania border after a long transmission.

2. Assuming this is not a mere accounting change but a change in rate formula, the matter is one that requires application of the procedure specified in § 4 of the Natural Gas Act in case of rate changes. Quoting from the Examiner's Decision:

Without further examining the merits of formula (B), it is hard to deny the Cities' real point that the proposal amounts to a change in rate and it must be filed and dealt with as such if their procedural rights are to be preserved. To test the point, it is necessary only to refer to the present New York tariff for its storage sales (item C by reference). * * * The critical element, "cost of gas," is defined * * * as the number of Mcf delivered from storage "multiplied by the weighted average cost per Mcf of Seller's inventory in both Storage Properties. * * *"

What formula (B) proposes is to interpret the words "weighted average costs per Mcf of Seller's inventory in

both storage properties" *not* for what they plainly say—the average cost of the actual storage inventory—but instead, for Hope's part of that inventory, to substitute the cost of the company's purchases in Louisiana and to presume, whether rationally or arbitrarily, that this cost will be about the same as the true average cost of the true storage inventory (meaning, of course, the Hope share of it). It is not at all understood how this revision of the plain words of the tariff can be described as mere bookkeeping. * * * [When] there is a change in the interpretation and application of a tariff, there is inevitably a change in rate in the legal sense, unless such words have quite lost their meaning. * * *

It is just for this reason that Section 4 of the Natural Gas Act, setting out the procedure for rate changes, their filing, public notice, complaint, hearing and decision, refers also to "practices, and regulations affecting such rates and charges," which are not to be changed without a new filing, public notice, possible suspension and hearing, and all subject to the Commission's order thereon.

This is not to suggest that formula (B) is necessarily wrong or unjustified —it is an obviously, indeed admittedly, pragmatic adjustment, open to change in the next rate case, and perhaps the best that can be devised under the circumstances. But all of this does suggest that this new and different application of the words of the tariff is the very equivalent of a revision of its actual words; and in fairness, the procedure should be that which the law provides for a change in the rate or tariff. No reason appears why the substance of formula (A) and (B) should not presently be filed as a rate change, to be followed by the regular procedures set out in Section 4 of the Natural Gas Act. Accordingly, the condition hereto attached so provides.

The case came to the Commission on exceptions by petitioners (opposing the merger), and not on exceptions by the

applicant.[3] The Commission rejected the Examiner's procedure, stating:

> We do not agree with the examiner that applicant must file its storage accounting proposal as a rate change under Section 4. The change giving rise to the necessity for the revised accounting procedure is to be a change in circumstance, namely, the corporate merger, and no "change in rate" actually will be effected. Instead, the procedure will simply maintain the existing level of rates to the greatest possible degree. Moreover, the procedure will be employed only on an interim basis. Under these circumstances, the permissive language of Section 4 does not necessitate the examiner's filing requirement.

Since this was a change in rate formula, and not a true accounting action, I think the Examiner was right and the Commission was wrong.

3. The Commission's brief argues that a new rate cannot be considered to be an increase over an old rate unless it will generate greater revenues. In the first place, § 4 applies to any change in rate or charge, not merely an increase. Furthermore, it seems to me that the change in rate is an "increase" when a rate formula is made more burdensome to the purchaser—and that is the case when a formula is revised so as to cancel its decrease provisions. Suppose a natural gas company with a customary cost of service tariff in effect in 1963 changed its tariff schedule at the end of 1963, in the face of the anticipated federal tax decrease, so that the federal tax payable portion of cost of service should henceforth be computed at the tax rates prevailing in 1963. Obviously such a company would be modifying its formula to the disadvantage of its purchasers even though it did not result in an increase in a specific gas charge. I can hardly conceive that the Commission would say that § 4 is inapplicable. Nor can I picture the Commission accepting that company's argument that its change was not governed by the last sentence of § 4(e), which places the burden on a company seeking an increase in its charges. I think there is an "increase" that triggers the applicability of § 4(e) when a company proposes a change that means a greater burden in dollars and cents to the purchaser than the burden that would result from the formula if unrevised.

My hypothetical example is not purely hypothetical. For the fact is that applicant-intervenor is contemplating a decline in its cost of service, and apparently a decline in the cost of service of both the Hope and the New York Natural sections of the new company. I read the record to suggest that this reduction may well make its appearance before the end of the three-year period specified in the Commission's conditions.

4. The Commission cannot avoid the need for § 4 procedure by saying that its approval of the so-called accounting pro-

---

3. In reply to petitioners' exceptions, Hope and the Commission staff supported the Examiner. Hope, however, commented as follows with respect to Paragraph (F) of the decision:

> While we agree with the results reached by the Examiner and, without objection, would comply with the requirements of Paragraph (F), we respectfully submit that parts of his discussion concerning this accounting matter are unnecessary to its proper disposition. Many changes of accounting, some at the instance of companies involved and some at the instance of the Commission itself, affect charges made under cost-of-service type tariffs. These, however, to our knowledge, have never required filings incorporating the accounting changes in such tariffs.

I agree that the Commission may issue accounting instructions and interpretations without being required to follow § 4 of the Act merely because rates may be affected. Section 8 of the Act, 15 U.S.C. § 717g, gives the Commission authority to prescribe accounts "by rules and regulations." The Commission's interpretative authority relates at least in theory to interpretation of its duly adopted general regulation. However, the action taken in this case by the Commission was not truly an accounting action and cannot reasonably be defended as such or as an accounting interpretation.

cedure was conditional and limited in time. If the Commission is right in theory it can extend the duration of this so-called accounting procedure without observing § 4 of the Act, and without a hearing of any kind.

Nor can the Commission avoid the issue by referring to § 4 as "permissive." A separate application filed under § 4, with the supporting data required by the Commission's regulations governing rate changes, would have focused on the change in formula. The Commission would not have been beguiled as it seems to have been here by the intriguing coincidence that no increase in dollar revenues would result. There would have been concentration on the rate aspects— which were generally excluded from the application under § 7—which might have led the Commission to a solution whereby East Ohio would be denied a windfall yet accorded a share of reduction in the cost of service to the Pennsylvania line. I do not think it can be assumed that a § 4 proceeding would have been an empty formality.

The Commission was probably forecasting that for various reasons it believed it in the public interest to approve such increase in net revenues as might result from the order here involved. On the hearing already held it might reach such a conclusion tentatively—for purposes of permitting the merger to proceed and preparation of invoices subject to final order. But it could not make such a determination as a matter of final adjudication without a hearing in which it would have before it the data required by its regulations to accompany rate changes, and an awareness of the dollar amount of increased net revenues ascribable to its action. See City of Detroit, Mich. v. FPC, 97 U.S.App.D.C.

260, 230 F.2d 810 (1955), cert. denied *sub nom.* Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).

Finally, the possibility or even probability that the FPC would have permitted the change to go into effect without holding a § 4 hearing does not mean that it can make a determination approving the change on the merits in the absence of a hearing. This would seem to be the corollary of the Third Circuit's holding in Mississippi River Fuel Corp. v. FPC, 3 Cir., 202 F.2d 899 (1953), that the Commission cannot reject rate change proposals without a hearing.

At the very least, there might be different consequences in the event of a future hearing under § 5 of the Act. Even the result reached in the instant case, if agreed to in the context of a § 4 temporary order, would place the burden on the company to justify the continuance of the so-called accounting change.

Contrariwise, under the procedure actually used by the Commission, the burden may come to rest on the Commission should it wish to terminate the accounting change.

Petitioners fairly argue that the question before us is whether the Commission erred in rejecting the Examiner's requirement because it thereby shifted the burden of proof from the utility to the consumers. Although petitioner's petition for rehearing before the FPC did not use the words "burden of proof," it clearly made the point that § 4 procedure should be followed; this obviously incorporates the last sentence of § 4(e) which puts the burden of proof on a ultility to justify any change in rate formula making it more burdensome to the purchaser.

I respectfully dissent.