419 F.2d 154
 ABC AIR FREIGHT COMPANY, Inc., et al., Petitioners,
v.
CIVIL AERONAUTIC BOARD, Respondent, and CF Air Freight,
Inc.; ConsolidatedFreightways, Inc.; P.I.E. Air Freight
Forwarding, Inc.; Pacific IntermountainExpress Co.; and
Navajo Freight Lines, Inc.; Yellow Freight System,
Inc.;Global Air Cargo,Ltd; Gateway Transportation Co., Inc.
and Gateway Aviation, Inc., InterveningRespondents.
 No. 254, Docket 33623.
 United States Court of Appeals Second Circuit.
 Argued Sept. 16, 1969.
Decided Oct. 24, 1969, Certiorari Denied March 30, 1970, See
90 S.Ct. 1233.
 
 Louis P. Haffer and Robert N. Meiser, Washington, D.C. (Andrew P. Goldstein, Washington, D.C., and Paul Berger, New York City, of counsel), for petitioners.
 O. D. Ozment, Deputy Gen. Counsel, Washington, D.C. (Warren L. Sharfman, Assoc. Gen. Counsel, Litigation and Research, J. Michael Roach and James Keough, Attys., Civil Aeronautics Bd., Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Joseph B. Goldman, Gen. Counsel, Civil Aeronautics Bd., Washington, D.C., of counsel), for respondent.
 John H. Wanner and Eugene T. Liipfert, Washington D.C. (Verner, Liipfert, Bernhard & McPherson, Washington, D.C., of counsel), Raymond J. Rasenberger, Washington, D.C. (Zuckert, Scoutt & Rasenberger, Washington, D.C., of counsel), and Robert J. Sisk, New York City (Hughes, Hubbard, Blair & Reed, New York City, New York, of counsel), for intervening respondents CF Air Freight, Inc., Consolidated Freightways, Inc., P.I.E. Air Freight Forwarding, Inc., Pacific Intermountain Express Co., and Navajo Freight Lines, Inc.
 Homer S. Carpenter, Washington, D.C., for intervening respondents, Yellow Freight System, Inc., Global Air Cargo Ltd., Gateway Transportation Co., Inc., and Gateway Aviation, Inc.
 Before LUMBARD, Chief Judge, FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 In A.B.C. Air Freight Company v. C.A.B., 391 F.2d 295 (1968), this court vacated an order of the Civil Aeronautics Board dealing with applications of motor carriers to operate as freight forwarders. The Board, with Vice Chairman Murphy dissenting, had granted applications of three long-distance truckers or their subsidiaries to act as air freight forwarders, along with related applications for approval of acquisitions of control, and had indicated an intention similarly to grant a fourth. We remanded the cause for further consistent proceedings. Having invited the parties to file briefs directed to the action it should take and having heard oral argument, the Board, with Vice Chairman Murphy again dissenting, rejected petitioners' contention that it should dismiss the proceeding or hold another evidentiary hearing. On the basis of further findings it granted the applications of CF Air Freight, Inc., and Navajo Freight Lines, Inc., to act as domestic and international air freight forwarders and of P.I.E. Air Freight Forwarding, Inc. to act as a domestic air freight forwarder for a period of five years; the Board also granted related applications with respect to acquisitions of control. The authorizations and approvals were made subject to numerous conditions which are set out in the margin.[1] The Board denied the motions of seven other motor carriers or their affiliates to intervene and have their applications consolidated. Instead it instituted a rule-making proceeding with respect to the handling of applications from these and other motor carriers and to the making of reports, of which more hereafter. Petitioners ask us to set aside the authorizations and to terminate the rule-making proceeding as contrary to our mandate and otherwise unlawful.
 
 
 2
 The 'most serious deficiency' we found in the Board's original order was 'the ambiguity whether the Board has established a policy of entry for all truckers who want to act as air freight forwarders or has merely granted the four applications that were before it, and the inadequacy of its consideration of effect on the existing forwarders if the former is the right interpretation as we strongly suspect.' 391 F.2d at 298. In addition, after citing the Board's previous policy of granting air forwarding authority to surface carriers 'only after study of the particularized situation convinced it that the carrier's conflict of interest would not 'result in material diversion of traffic from air to surface transportation and deprive the applicants of sufficient incentive to conscientiously promote and develop air-freight forwarding." Air Freight Forwarder Authority Case, Order E-21056, July 10, 1964 (mimeo, p. 4), we expressed concern that the Board had not adequately explicated what we considered to be a significant departure from that policy, 391 F.2d at 301-305. While we pointed out what seemed to be still other weaknesses in the Board's opinion, 391 F.2d at 305-307, which reinforced our conclusion that further consideration was desirable, we nevertheless recognized that even the present record might 'be sufficient for the Board to initiate a properly controlled experiment in the authorization of truckers as air freight forwarders, with the limitation on numbers and the reporting and other requirements an experiment would be expected to entail,' 391 F.2d at 307.
 
 
 3
 The opinion on remand, Motor Carrier-Air Freight Forwarder Investigation, No. 69-4-100, April 21, 1969, attempted to deal with these objections. With respect to the number of authorizations, the Board emphasized 'that it is granting only the applications before it and not passing upon any others,' save for a declaration that it 'should not deem the size, geographical extent, or general commodity rights of a trucker's surface operations or authority-- of themselves-- as factors showing that the trucker should be barred from the air freight forwarding business.' Id. (mimeo, pp. 3-4). The Board made clear, however, that this declaration meant just what it said and no more:
 
 
 4
 But long-haul truckers of general commodities will not be granted air forwarding licenses routinely. Instead, each trucker applicant will be required to show that it will conscientiously promote air cargo and that its operations, either alone or in combination with others already licensed, will be in the public interest. The Board will not be satisfied with mere recitations; it will scrutinize each application (and any objection) to insure that these criteria are met. And the Board will maintain a close watch over the experiment through new and more detailed reporting requirements. As a final safeguard, the Board will reserve the power to suspend the processing of new applications and, if necessary, even to terminate outstanding licenses. This policy is being codified in proposed regulations issued concurrently with this order. For long-haul truckers who seek to become air forwarders, the rule will not be free entry, but monitored entry.
 
 
 5
 Turning to the matter of surface carrier participation, the Board reiterated its position that the second proviso to 408(b) of the Federal Aviation Act, 49 U.S.C. 1378(b) (1964), was inapplicable to air freight forwarding, not merely in precise terms as we had agreed, 391 F.2d at 302, but at all.[2] However, noting our recognition that 'the Board might conclude, after studying the proposals of a particular surface carrier, that despite its conflicts of interest the applicant will conscientiously promote air transport,' 391 F.2d at 304, it found, after detailed examination of the record, that 'the three successful applicants have clearly met that test' and concluded that 'the time has come * * * to test the conflicts hypothesis in a controlled experiment.' This was to be made possible by the detailed reporting requirements imposed on the three successful applicants, similar requirements proposed for imposition on other successful trucking aspirants, and new reporting requirements proposed for the independents.
 
 
 6
 The rule-making proceeding initiated simultaneously with the order fell into two main parts. One part concerned applications of long-haul motor carriers of general commodities for air freight forwarding authority or for approval of control of air freight forwarders. The proposed regulations provide that such authority or approval may be granted,
 
 
 7
 on an individual application basis, with or without hearing, upon a showing that (1) the applicant is capable of performing the proposed air transportation and of conforming to the Act and the regulations thereunder; (2) the applicant will conscientiously promote air cargo and will benefit air transportation; and (3) the applicant's operations, alone or together with those of other similar carriers granted air forwarding authority, will not result in creating a monopoly or monopolies and thereby restrain competition, or jeopardize another air carrier and will not otherwise be inconsistent with the public interest * * *.
 
 Any applicant must show:
 
 8
 (a) A plan to conscientiously promote air cargo. This showing shall include, inter alia:
 
 
 9
 (1) A statement as to whether the long-haul motor carrier plans to solicit existing surface customers for air cargo and, if so, the extent of such plans;
 
 
 10
 (2) A traffic estimate showing what traffic is newly-generated or presently shipped by surface means;
 
 
 11
 (3) An estimate of what portion of the long-haul motor carrier's existing surface traffic is subject to diversion to air;
 
 
 12
 (4) An estimate of beyond-terminal-area traffic moving by surface transportation over the routes of the long-haul motor carrier or via interline agreements; and
 
 
 13
 (5) A statement of the proposed air cargo sales force and facilities.
 
 
 14
 (b) A statement of the long-haul motor carrier's authority from the Interstate Commerce Commission or other regulatory agency, including a description of surface transportation authorized and offered at the stations at which air forwarding operations are proposed.
 
 
 15
 (c) A statement of any other advantages which would result from approval of the application.
 
 
 16
 Authorizations are to continue until they expire by their terms, the relevant regulations are terminated or revoked, or the Board in revocation proceedings finds that continued operation is contrary to the licensing criteria. The other part related to reporting. Long-haul motor carrier applicants who qualified in the future would be required to file reports similar to those imposed as conditions on the three successful applicants, see fn. 1. In addition, all other air freight forwarders would be required to make additional reports, with the objective of placing the Board in a position where it will be able to obtain a rather complete statistical picture of the entire industry.
 
 
 17
 We find it unnecessary to deal with petitioners' contentions that since the Board failed to petition the Supreme Court for review of this court's decision, it was bound to give our views with respect to the policy concerning surface carrier participation in air freight forwarding greater weight than it did. Apart from the problem raised by the agency's likely inability to obtain certiorari to review an order of remand, cf. F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 383, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), and the possible bearing of Pub.L. No. 91-62, see fn. 2, we are satisfied that the nuance of difference between the Board's views and those intimated in our previous opinion did not affect its decision. Fully recognizing its responsibility to develop air transportation, the Board did not deny that it must consider the bearing of a prospective air freight forwarder's involvement in surface transportation; it said only that this should not constitute a bar. Here it satisfied itself that, in light of the plans of two of the applicants to conduct their air freight forwarding through separate companies and of the third to conduct its through a separate division with a management team recruited from the aviation industry and dedicated to air cargo's promotion, the applicants would not seek to divert potential air cargo to surface transport but rather would zealously promote it. Petitioners say the Board was too easily satisfied and contend that the regulations proposed in the rule-making proceeding demonstrate this. But the former issue was for the Board to decide and we cannot take the Board's professions with respect to its future policy so lightly as petitioners would have us, see F.C.C. v. Schreiber, 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965). While the proposed regulations do not assure a hearing, they do permit any interested person to object to any new authorizations on the ground, among others, of a belief 'that the long-haul motor carrier or its affiliate will not promote air cargo.' While it may indeed be difficult to establish this at the start, the reports to be filed by the three successful applicants and other long-haul truckers that may receive authority in the future will ultimately afford a basis for truly informed decision on an issue that now lies in the realm of conjecture.
 
 
 18
 Similar considerations require us to reject petitioners' contention that the Board's avowed limitation on the number of applications granted is simply a form of words. When an independent regulatory agency says that 'long-haul truckers of general commodities will not be granted air forwarding licenses routinely' and that its policy toward them 'will not be free entry, but monitored entry,' a reviewing court must assume the agency means what it says, unless and until experience should indicate the contrary. We will expect the Board to be selective in accordance with its word. We would assume, for example, in light of the Board's expressed concern that the nation's three largest cities are now responsible for more than half of all air freight forwarder tonnage and the 10 leading cities for over three-quarters, whereas 101 of the 131 cities reported produced less than 5%, that it would prefer long-haul trucker applicants with well laid plans to develop the lesser markets, in contrast, e.g., to an applicant planning, as Consolidated Freightways is doing, to operate for the first year only in the four cities ranking highest in volume of air freight forwarder traffic, and would not multiply the latter type of authorization in the absence of a strong showing of public interest. In sum we expect that the Board will in time demand that the performance of the long-haul truckers as air freight forwarders should conform to the rationale stated for their authorization, and that if the 'controlled experiment' proves disappointing, new authorizations will not be granted and existing ones may be revoked. We anticipate also that in granting added authorizations to long-haul truckers the Board will take the condition of the independent forwarders into proper account. In performing these difficult tasks the Board will be immeasurably aided by the detailed reporting requirements imposed or proposed as a result of the remand. If deficiencies should emerge in the Board's performance, these can be brought before a court at an appropriate time.
 
 
 19
 While we have felt free to consider the Board's proposed regulations as casting light on its action in granting the three authorizations, as all parties have agreed to be proper, we have no power to terminate the rule-making proceeding with respect to the long-haul truckers, as petitioners ask, even if we had any will to do so. Although comments on the proposed regulations were due by May 23, 1969, the Board has not yet acted upon them, and review would thus be premature. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Neither would the situation be altered if the regulations with respect to long-haul truckers are adopted. These regulations, in contrast, to any new reporting requirements on the independents, do not compel petitioners to do anything they have not previously done or to refrain from doing anything they were previously permitted to do, as in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Petitioners will be affected by the regulations only when, as and if the Board grants further authorizations to long-haul truckers under them. We need not consider whether review could be had, or where, if the mere possibility of such grants were unlawful since, for reasons indicated, we do not believe this to be so. Failing that, review must await further grants pursuant to the regulations, by which petitioners might be aggrieved.
 
 
 20
 Insofar as the petition to review is addressed to Order 69-4-100, it is denied; insofar as it is addressed to the Notice of Proposed Rule Making, it is dismissed.
 
 
 
 [1]
 7. That the authorizations and approvals granted herein shall be subject to the following conditions:
 (a) The Board may revoke an authorization or approval, in whole or in part, if it finds after hearing that (i) the holder is no longer capable of performing the authorized air transportation or of conforming to the Act or the regulations thereunder; (ii) the holder is no longer willing to conscientiously promote air cargo and to benefit air transportation; or (iii) the holder's operations, alone or together with other similar carriers granted air freight forwarding authority, will create a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party thereto, or will otherwise be inconsistent with the public interest.
 (b) If proceedings are instituted to revoke an authorization or approval under paragraph 7(a), the Board may suspend or limit such authorization or approval pending the outcome of the proceedings in accordance with the procedures specified by Sections 296.48 and 297.43 of the Board's Economic Regulations.
 (c) CF Air Freight, Inc., Navajo Freight Lines, Inc., P.I.E. Air Freight Forwarding, Inc., and National Air Freight Forwarding Corporation shall file, in addition to the financial and statistical reports prescribed by Part 244 of the Board's Economic Regulations, the following schedules in the format attached to this order:
 (i) The 'Originating Air Station Data' schedule reflecting the source of air freight tonnage enplaned and deplaned at originating air station (exclusive of reconsolidations) and data on the miles of surface movement of the air freight before and after its air transportation.
 (ii) The 'Supplemental Operating Statistics' schedule reflecting the number and weight of those air freight shipments handled by both the air freight forwarder and the surface carrier who is its parent or affiliate or who operates as a separate division within the same corporate structure.
 (iii) The 'Analysis of Traffic by Weight Breaks' schedule reflecting, by specified weight breaks, the number and weight of shipments handled in air freight forwarding operations and the revenues received for the shipments.
 (d) The persons named in paragraph 7(c) above shall also file with the Board, within 45 days after the close of each calendar year, a report showing as of December 31 of such year the location of each specialized air freight forwarding station and of each surface transport terminal at which air freight forwarding services are offered. The statement shall indicate, for each station or terminal, the number of drivers, salesmen, and other personnel who are assigned to promote air freight exclusively.
 (e) Navajo Freight Lines, Inc., Pacific Intermountain Express Co., and Consolidated Freighways, Inc., shall file with the Board's Bureau of Accounts and Statistics, not later than 45 days after the end of each calendar quarter, the 'Analysis of Traffic by Weight Breaks' schedule, in the format attached to this order, reflecting, by specified weight breaks, the number and weight of shipments handled in long-haul motor carrier operations and the revenues received for the shipments.
 (f) In addition, the persons named in paragraph 7(e) above shall file the 'Analysis of Traffic by Weight Breaks' schedule showing comparable data, to the extent available, for the corresponding quarter of each of the preceding five years.
 
 
 [2]
 Some added support for the Board's position was furnished subsequent to its decision by Pub.L. 91-62 1(2) (Aug. 20, 1969), 83 Stat. 103, amending 408(a)(5) of the Federal Aviation Act, which authorizes the Board to exempt any acquisition of a noncertificated carrier from the requirement of approval 'to the extent and for such periods as may be in the public interest.'