665 F.2d 1112
 214 U.S.App.D.C. 294
 The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Graphnet, Inc., et al., Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
ITT World Communications, Inc., et al., Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Southern Pacific Communications Company, et al., Intervenors.
TRT TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
RCA Global Communications, Inc., et al., Intervenors.
ITT WORLD COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Western Union Telegraph Company, Intervenor.
WESTERN UNION INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
RCA GLOBAL COMMUNICATIONS INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
TRT Telecommunications Corporation, et al., Intervenors.
 Nos. 79-1352, 79-2495, 80-1030, 80-1109, 80-1155, 80-1275
and 80-1320.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 8, 1981.
Decided Sept. 2, 1981.
 
 Petitions for Review of Orders of the Federal Communications commission.
 Joel Yohalem, Washington, D. C., with whom Peter G. Wolfe, Washington, D. C., was on the brief, for petitioner/intervenor W. U. Tel. Co.
 Lawrence W. Secrest, III, Washington, D. C., with whom Robert E. Conn, New York City, Howard D. Polsky, Washington, D. C., and Robert Michelson, New York City, were on the brief, for petitioner Western Union International, Inc.
 H. Richard Schumacher, New York City, with whom Donald J. Mulvihill, Washington, D. C., was on the brief, for petitioner/intervenor RCA Global Communications, Inc.
 John E. Ingle, Deputy Associate Gen. Counsel, Federal Communications Commission, Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, David J. Saylor, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Federal Communications Commission, and Stanford M. Litvack, Asst. Atty. Gen., Barry Grossman, Robert B. Nicholson, Andrea Limmer, and Margaret G. Halpern, Attys., U. S. Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 
 
 1
 John A. Ligon, New York City, was on the brief for petitioner/intervenor ITT World Communications, Inc.
 
 
 2
 Edward P. Taptich and Stanford B. Weinstein, Washington, D. C., were on the brief for intervenor Graphnet, Inc.
 
 
 3
 H. Richard Schumacher, New York City, Donald J. Mulvihill, and Gerald J. Brown, Washington, D. C., were on the brief for intervenor RCA Global Communications, Inc.
 
 
 4
 E. Edward Bruce and William P. Mayer, Washington, D. C., entered appearances for petitioner/intervenor TRT Telecommunications Corp.
 
 
 5
 James M. Tobin and John V. Kenny, Washington, D. C., entered appearances for intervenor Southern Pacific Communications Co.
 
 
 6
 Michael H. Bader, Kenneth A. Cox, William J. Byrnes, and John M. Pelkey, Washington, D. C., entered appearances for intervenor MCI Telecommunications Corp.
 
 
 7
 Joseph J. Jacobs, New York City, entered an appearance for intervenor ITT World Communications, Inc.
 
 
 8
 Before BAZELON, Senior Circuit Judge, and TAMM and MIKVA, Circuit Judges.
 
 
 9
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 10
 We address in this opinion petitions of certain international record carriers (IRCs) and the Western Union Telegraph Company (WU) requesting review of two decisions adopted by the Federal Communications Commission (FCC or Commission) in its recent efforts to obtain for communications customers the benefits of a competitive market structure. In Docket No. 79-1352, WU seeks reversal of the Commission's authorization of Graphnet Systems, Inc., as a competitor of WU in the domestic telegraph service market. In Docket Nos. 79-2495, et al., WU challenges the Commission's decision not to apply to Graphnet the current international formula for outbound traffic distribution while continuing to apply that formula to WU. In those same cases the IRCs challenge the Commission's determination that the current formula is no longer in the public interest. We believe that the IRCs' claims in Docket Nos. 79-2495, et al., are premature and find WU's contentions, in both Docket Nos. 79-2495, et al., and Docket No. 79-1352, without merit. Accordingly, we dismiss the petitions of the IRCs and affirm as reasonable the Commission's actions regarding WU.
 
 I. BACKGROUND
 A. The Origin: PMS
 
 11
 On June 23, 1977, Graphnet Systems, Inc., filed a section 214 application, requesting Commission approval of its proposal to convey inbound international messages from the gateway locations of the IRCs to recipients located in the hinterland.[1] The Commission's initial consideration of Graphnet's application did not address the merits of that proposal. Instead, noting that the application "raises a significant number of policy issues,"[2] Graphnet Systems, Inc., 67 F.C.C.2d 1059, 1061 (1978) (Memorandum Opinion and Order and Notice of Inquiry and Proposed Rulemaking) (PMS Notice), the Commission set for investigation and resolution four questions, including whether the domestic telegraph market should be opened to competition and what regulatory changes, if any, should follow the adoption of such a policy. Id. at 1070. The Commission also designated Graphnet's application for hearing but decided that its further consideration must await the Commission's conclusions in its proposed inquiry.
 
 
 12
 At the termination of this proceeding, the Commission issued its order of March 28, 1979. Graphnet Systems, Inc., 71 F.C.C.2d 471 (1979) (hereinafter PMS ). In that order the Commission determined that the public interest did not require the retention of WU as the sole source supplier of public message telegraph service (PMTS or PMS).[3] It recognized, however, that the operation of a competitive market would necessitate concomitant adjustment in the regulatory requirements imposed upon potential entrants in the PMTS market and in the regulation of those entrants subsequent to entry. Since its finding that multiple entry was in the public interest obviated any need for information pertaining to the public's need for new service, the Commission indicated that for PMTS applicants it would waive compliance with those portions of section 63.01 of its rules requiring the carrier's demonstration of public need for its facility, economic justification, and inadequacy of existing facilities. Id. at 522. Similarly, because competition might well eliminate the potential for cross-subsidization, the Commission found "no compelling reason to discriminate against Western Union in its ability to provide service or to modify existing service." Id. at 524. Instead, it concluded, WU "should be relieved of the requirements which were especially imposed upon it solely by virtue of its offering of PMTS." Accordingly, it promised to address "these and similar questions" in the "near future." Id.
 
 
 13
 Following its adoption of an open-entry policy in the PMTS market, the Commission renewed its consideration of Graphnet's application. The Commission first determined that its new policy eliminated previously perceived policy barriers to Graphnet's entry.[4] It then determined that Graphnet's proposed service would enhance "the nature and quality of international telegrams and telegraph message service," and that Graphnet's entry "could help check (through competitive pressure and cost saving innovation) the rising costs of inbound message delivery." Id. at 528. For these reasons, the Commission concluded that an immediate grant of Graphnet's section 214 application was in the public interest. Id.
 
 B. Subsequent Events
 
 14
 Thereafter, WU filed in this court a petition for review and a motion for partial stay of Graphnet's authorization. Noting that "Western Union has what is prima facie a meritorious claim to be protected from new competition to operate under more advantageous conditions than Western Union," the court granted WU's motion. Western Union Telegraph Co. v. FCC, No. 79-1352 (D.C.Cir. June 18, 1978) (order granting partial stay). Upon that grant, however, the court imposed two conditions. First, the stay was to be suspended when the FCC issued a "notice proposing for consideration ... action that will modify or terminate the burden under the 1943 order of which Western Union complains." Id. at 2. Second, that suspension would remain effective only for 120 days. As the court explained: "the Court anticipates that the FCC will made (sic) a determination of the matter one way or another within the one-hundred twenty day period." Id.
 
 
 15
 Pursuant to this order, the Commission adopted on July 19, 1979, a notice of inquiry and proposed rulemaking, Regulation of Domestic Public Message Service (Notice of Inquiry and Proposed Rulemaking) FCC 79-442 (July 23, 1979) (hereinafter Formula Notice), in which it proposed and submitted for comment certain rule changes designed to provide WU its requested regulatory relief. Formula Notice at 1. See note 12 infra. The Commission also invited comment on its proposed substitution of "a system that will allow the domestic and international carriers to negotiate agreements for the handling of inbound and outbound international traffic and file tariffs based on such agreements" for the present "rigid" international formula. Id. at 11.[5] It believed that this system would permit the carriers "to negotiate the best possible prices" and to keep the hinterland rates as low as possible, thus "benefiting the public by (reducing) the costs of ... international service...." Id.
 
 C. The Formula Decision
 
 16
 After reviewing the comments generated by its Notice, the Commission issued its order of January 7, 1980. Regulation of Domestic Public Message Service, 75 F.C.C.2d 345 (1980) (hereinafter Formula). In that portion pertinent to this appeal, the Commission first reiterated its belief that PMS and other, subsequent, FCC decisions had significantly affected the nature of the working relationship between WU and the IRCs.[6] Because the previously static nature of that relationship had been the primary premise underlying the Commission's prescription of the 1976 formula, the Commission concluded that a reexamination of that formula in light of changing market conditions was warranted. Formula, 75 F.C.C.2d at 358.
 
 
 17
 In this reexamination the Commission determined, at the outset, that the current formula had not accomplished its established objectives. The FCC had expected that the formula would stimulate price and service quality competition among the IRCs. Id. at 365. Instead, the Commission found that the formula had had little positive impact on the IRCs' actions[7] and, in fact, had acted as a barrier to price competition.[8] Moreover, the Commission concluded that whatever the impact of the present formula, the significance of its role would be diminished by the new market conditions. Id. at 366. For these reasons the Commission declared the current formula not in the public interest.
 
 
 18
 In spite of this declaration, the Commission declined to prescribe a new formula. It explained that there was simply "not enough information to allow the Commission to prescribe a replacement ... formula at this time because of the vastly changed circumstances which the industry will face after our actions today and in the wake of our Domestic PMS decision." Id. at 370. Moreover, the Commission refused as well to apply the current formula to Graphnet. Neither the statute[9] nor the public interest, it concluded, required such action. Instead, citing the need for a transitional period, the Commission ordered that the current formula remain in effect pending its further order, and designated a nine-month period in which the affected carriers were to negotiate new agreements for the distribution of unrouted outbound international message traffic. Agreements reached would be subject to Commission evaluation and approval under the "just, reasonable, equitable and in the public interest" standard. Id. at 370-71; 47 U.S.C. § 222(e)(3) (1976). If no agreements were reached at the end of the designated period, the Commission would itself take appropriate steps to revise the formula. Accordingly, the Commission directed the staff of the Common Carrier Bureau to prepare and submit its proposed method of distribution as soon as possible after the close of that same nine-month period. Id. at 378.
 
 II. DISCUSSION
 A. Western Union's Petitions
 
 19
 WU asserts in this court no objection to the interjection of competition into telecommunications markets. It does, however, object strongly to the Commission's failure to equalize the regulatory burdens to which it and Graphnet are subject, and urges reversal of both PMS and Formula on that basis. WU further claims that PMS may be reversed because the Commission failed to explain its inconsistent analysis of the applicability of its Free Direct Access decision to Graphnet's application, and because the Commission based Graphnet's PMS authorization on controverted factual assertions without benefit of a hearing.
 
 
 20
 WU's latter claims may be briefly considered. WU argues that the Commission's grant of Graphnet's application rests on unsupported pleading allegations and that the Commission simply ignored WU's attempts "to apprise the Commission (1) that Graphnet's proposed service would be far inferior to the existing service provided by Western Union and (2) that diversion of traffic to Graphnet would cause upward pressure on Western Union's unit costs (and hence rates)." Brief for Petitioner WU at 33. WU also contends that these "factual disputes" could have been resolved at the designated hearing which the FCC, "(f)or some unexplained and inexplicable reason," cancelled. Id. at 31.
 
 
 21
 We agree with the Commission that these allegations miss the mark. The Commission was not required to address the "factual disputes" which WU raises here because Graphnet's certification did not rest on their resolution. Instead, that authorization was granted pursuant to the Commission's adoption of an open-entry policy. As the Commission recognized, a rulemaking of this nature may dispose of any need to address the issues of the need for new service, the adequacy of existing service, and the desirability of competitive entry, on a case-by-case basis. PMS, 71 F.C.C.2d at 520-21. See American Telephone and Telegraph Co. v. FCC, 539 F.2d 767, 774-75 (D.C.Cir.1976); Washington Utilities and Transportation Commission v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). Because the allegations which WU claims the Commission ignored are primarily relevant to the issue of whether multiple entry is desirable, and the Commission has determined that issue in its rulemaking, the Commission is not required to redetermine the issue in the context of Graphnet's application. If WU wishes to press its allegations further, it must challenge the Commission's conclusion that a competitive PMTS market is in the public interest, a course it specifically disavows in this proceeding. Brief for Petitioner WU at 21-22. Additionally, because controverted facts did not form the predicate for Graphnet's certification, the Commission's cancellation of the hearing previously designated was reasonable. See AT&T, 539 F.2d at 775.
 
 
 22
 WU also challenges as arbitrary and capricious the Commission's failure to explain its "inconsistent" action regarding the applicability of the FDA decision to Graphnet's application. In support of this challenge, WU argues that to the extent the Commission's discussion in PMS implies that a grant of section 214 authority itself renders FDA policies inapplicable, that discussion conflicts with the Commission's previous statement that FDA provided a separate basis for rejecting Graphnet's proposal. WU further claims that the Commission's reliance on the proposition that, if so authorized, Graphnet would operate as a participating carrier with the IRCs on a bona fide division of revenues basis, is inconsistent with its earlier rejection of that arrangement as contrary to FDA.[10]
 
 
 23
 In Graphnet Systems, Inc., 64 F.C.C.2d 1021 (1977), the Commission cited two reasons for its rejection of Graphnet's tariff revisions. First, the service proposed therein was a public message service and thus outside the scope of Graphnet's section 214 authority. Id. at 1023. Second, the offering was apparently contrary to the Commission's FDA decision. In that decision, the Commission stated, it had held
 
 
 24
 that where hinterland delivery was performed by any party other than Western Union, the customer would have to pay the charges for service from the gateway to the hinterland location and that the alternative delivery mode could not be the agent of the IRC.
 
 
 25
 Id. Under Graphnet's proposal the IRC could select either Graphnet or WU for hinterland delivery and, because Graphnet (like WU) would be compensated for its delivery on a division of revenues basis, the charges to the consumer would be unaffected by the IRC's selection. Thus, "the IRC would be absorbing the landhaul charge and ... Graphnet would be the agent of the IRC"-a result contrary to the Commission's FDA policies.[11] Id. at 1024.
 
 
 26
 In PMS, the Commission recognized that these policies had constituted an independent ground for rejection. PMS, 71 F.C.C.2d at 525. It explained, however, that the authorization of multiple entry changed "an essential premise" in its analysis of FDA 's applicability. Under an appropriate grant of section 214 authority, Graphnet could, like WU, "pick up, carry and deliver telegrams and telegraph messages ... between the hinterland points and the gateway locations of the IRCs as a domestic telegram carrier." Id. at 526 (emphasis added). Moreover, unlike the carriers in FDA whose offering and responsibility therefor ran only to the IRC with whom they contracted, Graphnet proposed to "accept responsibility for hinterland pickup and delivery ... and to offer international service as a participating carrier with the IRCs on a bona fide division of revenue basis." Id. at 527. Since in this context Graphnet would not be an IRC agent, but a domestic telegraph carrier responsible to the hinterland customer, the Commission concluded that its FDA policies were inapplicable to Graphnet.
 
 
 27
 We find the Commission's course of action neither arbitrary nor capricious. Although, as indicated above, the Commission did change its position regarding FDA 's applicability to Graphnet's situation, the basis for that change was carefully stated in the Commission's PMS discussion. We believe that reference to that discussion readily explains the specific "inconsistencies" of which WU complains, and for that reason find no basis on which to require the Commission to explain each of its previous statements on the issue. We therefore decline WU's invitation to reverse Graphnet's certification on this ground.
 
 
 28
 WU's final claim encompasses both the PMS and the Formula orders. In that claim, WU argues that this court's stay order of June 18, 1979, establishes that the Commission's certification of Graphnet, absent contemporaneous changes in its regulatory scheme, was arbitrary and capricious. WU further contends that the Formula order did not cure the defects of PMS and urges reversal of both orders until regulatory parity is achieved.
 
 
 29
 In assessing this claim, we note initially that in its stay order this court observed that WU had a prima facie meritorious claim and directed that the Commission propose for consideration action modifying or terminating certain regulatory requirements imposed on WU. It did not dictate the result the Commission was to reach in that further consideration. We also note that the Commission has in fact provided much of WU's requested regulatory relief.[12] WU contends, however, that the more significant burdens remain. For this reason it challenges the Commission's deferred consideration and ultimate disposition of WU's request for exemption from the requirements of section 61.38 of the FCC rules, 47 C.F.R. § 61.38 (1980), and its refusal either to amend the formula or to make it applicable to Graphnet.
 
 
 30
 Section 61.38 requires all common carriers to file with proposed tariff changes extensive financial information and market data supporting those changes. In the Formula Notice, the Commission noted the suggestion that these support requirements be simplified or eliminated. It declined, however, to evaluate the merits of that suggestion in the context of the Formula proceeding. Instead, because tariff support requirements applied to all carriers' tariff changes, the Commission deferred consideration of the issue to an inquiry "which shall properly review the burdens placed on all competitive carriers in the context of their peculiar market situation." Formula Notice at 2, n.3.
 
 
 31
 As promised, the Commission instituted a rulemaking proceeding in which it proposed, inter alia, to relieve "non-dominant" carriers of some of their section 61.38 obligations. Competitive Common Carrier Services, 77 F.C.C.2d 308 (1979). In that proceeding, however, it determined that WU was a "dominant" carrier for purposes of applying the revised regulatory standards, and on that basis denied WU its requested relief. WU claims that this refusal to grant it relief subjects WU to a regulatory burden which others, similarly situated, do not bear. WU's injury, however, did not arise from the Commission's decision in Formula; the Commission's denial of WU's request for exemption was encompassed in its Competitive Carriers order-a decision not presently before us. In its Formula decision, the Commission's only action with respect to the applicability of section 61.38 requirements was a reiteration of its decision to address the issue in another, ongoing proceeding. Formula, 75 F.C.C.2d at 373 n.15. Because that issue was in fact addressed, WU cannot claim injury from a failure to act on this petition for relief. The Commission has broad authority to order its own docket.[13] Thus, WU can only complain of the Commission's disposition of that petition. As we have stated, such a complaint must be lodged in a petition for review of the Competitive Carriers order.
 
 
 32
 WU contends that as a result of the Commission's failure to abolish the formula or, in the alternative, to apply the formula to Graphnet, it remains "exposed to competition from virtually unregulated new entrants" while subject to "significant regulatory burdens that inhibit its ability to compete." Brief for Petitioner WU at 23 (footnote omitted). WU further contends that the duration of its injury is indeterminate, claiming that absent some court-provided incentive, the present formula "is likely to remain in effect for an extended period ...." Id. at 24.
 
 
 33
 We find these contentions without merit. WU would have this court assess the reasonableness of the Commission's action solely in terms of the relief afforded WU. Any action taken with respect to the formula, however, necessarily implicates the relationship of WU with the IRCs and must be assessed in light of industry conditions rather than in the narrow context of the relative competitive positions of WU and Graphnet. When so assessed, the Commission's actions here must be upheld as reasonable.
 
 
 34
 The Commission's several decisions-Formula, the other orders released that same day, and PMS -were expected to alter significantly the industry's market structure and to necessitate concomitant adjustment of the carriers' interrelationships. As the Commission realized, however, expectations such as these do not provide a sufficiently specific basis upon which to premise the prescription of a new formula. The Commission therefore properly declined to abolish the current formula, providing instead a transition period in which the carriers could initiate the necessary market adjustments and thus supply some concrete information upon which the Commission could reasonably act. Formula, 75 F.C.C.2d at 370. We do not believe WU suffered unduly from this deferral. Although the Commission did not actually abolish the formula, it did find the present formula not in the public interest. Moreover, it indicated clearly its determination to obtain a formula more responsive to a competitive market structure. If the parties did not provide a sufficient basis for prescription within nine months, the Commission stated, it would "take appropriate steps to revise the current formula." 75 F.C.C.2d at 370.[14]
 
 
 35
 The Commission's refusal to apply the formula to Graphnet was also clearly reasonable. Although, as WU contends, that application might have provided the regulatory parity it seeks, equalization of competition is not itself a sufficient basis for Commission action. Instead, as the Commission recognized, it must evaluate that action in terms of the public benefits, as provided by Hawaiian Telephone Co. v. FCC, 498 F.2d 771, 775-76 (D.C.Cir.1974). In this instance, the Commission found no public benefits to be derived from an application of the current formula to Graphnet. Since Graphnet, so recently authorized to compete in the PMS market, had as yet shown no capability for exercising the kind of monopoly power the formula was designed to control, id. at 372, application of the formula would have been premature. Moreover, the Commission had found the current formula no longer in the public interest; therefore, its application to a new carrier would only compound the problems purportedly created by the formula's operation. Finally, although the Commission refused to subject Graphnet to the formula, the Commission stated that it would "not allow Graphnet to use its possibly greater flexibility to obtain an unfair competitive advantage over Western Union," id., and indicated as proof of its position its invalidation of portions of contracts between Graphnet and the three largest IRCs. The deleted portions would have allowed distribution of outbound unrouted traffic to those IRCs in proportion to the amount of inbound traffic directed by those IRCs to Graphnet.[15] 75 F.C.C.2d at 372. See Domestic Public Message Services, 73 F.C.C.2d 151, 157-64 (1979), on reconsideration of Graphnet Systems, Inc., 71 F.C.C.2d 471 (1979).
 
 
 36
 In sum, we believe that the Commission's order in Formula offers WU little ground for complaint. We realize that the Commission refused to "equalize" the competitive situations of WU and Graphnet, either by relieving WU of the burden of the formula or by imposing that burden upon Graphnet. The Commission was necessarily obliged to consider other interests, however, particularly the public's, and we cannot require their disregard for the sake of immediate regulatory parity. Moreover, the Commission was not unresponsive to WU's claims. Although it did not abolish the formula, the Commission did find it no longer in the public interest and established a defined transition period preparatory to its expected revision. Similarly, although the Commission did not mandate the formula's application to Graphnet, it clearly indicated that Graphnet would not be permitted to take undue advantage of its relative regulatory freedom. For these reasons we affirm as reasonable the Commission's actions with regard to WU.
 
 B. The IRC Petitions
 
 37
 In general, the IRCs contend that the FCC's abandonment of the existing international formula and its proposed substitution of negotiated agreements are unsupported by the record and inconsistent with the congressional intent underlying section 222(e) of the Act.[16] We cannot evaluate the merits of these contentions, however, without determining preliminarily that they are ripe for judicial resolution.[17] For this reason we turn first to the parties' arguments on this point.
 
 
 38
 The Commission claims that the IRCs' complaint is not with its finding that the current formula is not in the public interest, but with its proposal for the replacement of the statutory formula with negotiated contracts. Such a complaint is premature, the Commission argues, because it has not yet finally determined the appropriate mode for distributing outbound traffic. Instead, it explicitly reserved for a further proceeding the prescription of a new formula. In that proceeding the IRCs will have an opportunity to present their arguments regarding the proposal's lawfulness under section 222(e). If they are aggrieved by the formula actually prescribed, they may then appeal. Until that time, however, the IRCs can claim no injury; the current formula continues to govern the distribution of international outbound traffic.
 
 
 39
 The IRCs respond that their challenge is in fact directed to the Commission's final determination that the current formula is not in the public interest. They argue that the Commission has said "all that it will ever say" on the issue and that there is no benefit to be derived from a delay of judicial review. Reply Brief for Petitioner Western Union International at 7. Moreover, the IRCs claim injury from this FCC decision. They allege a substantial interest in the operation of the current formula, asserting that the Commission's invalidation of that formula creates uncertainty in their business planning. Reply Brief for Petitioner/Intervenor RCA Global Communications, Inc., at 9.
 
 
 40
 An accurate assessment of the merits of these contentions necessarily requires reference to that body of principles and policies which constitute the ripeness doctrine. As the Supreme Court explained in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967):
 
 
 41
 (The doctrine's) basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
 
 
 42
 To promote this rationale, the Court articulated a methodology requiring evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. As both the Supreme Court and this court have recognized, these evaluations are informed, essentially, by pragmatic considerations. See, e.g., FTC v. Standard Oil Co. of California, 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980); Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); Papago Tribal Utility Authority v. FERC, 628 F.2d 235, 239 (D.C.Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); Conway Corp. v. FPC, 510 F.2d 1264, 1267 (D.C.Cir.1975), aff'd, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). Accordingly, they have looked to the order's "practical function and consequences in the relevant statutory scheme," Papago, 628 F.2d at 239, and its impact on the "day-to-day business" of the complaining parties. Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. at 1517.
 
 
 43
 A pragmatic appraisal of the Commission's finding that the current formula is not in the public interest requires the conclusion that it lacks the requisite characteristics of finality. Under section 222(e)(3), the Commission shall prescribe a new formula for the distribution of outbound traffic whenever it finds, after a full hearing, that the present distribution is "unjust, unreasonable, or inequitable, or not in the public interest." 47 U.S.C. § 222(e)(3) (1976). Whatever importance normally attaches to this statutory finding, it lacks, in the present circumstances, practical significance. The Commission did not, on the basis of its finding, prescribe a new formula or implement an interim formula. Instead, it established a "transitional" period. During this period the IRCs and WU will continue to operate under the current formula until the Commission's "further order." Formula, 75 F.C.C.2d at 370-71. The Commission's finding that that formula is not in the public interest does not, therefore, presently affect the IRCs' conduct of their day-to-day business.
 
 
 44
 In light of this appraisal, we believe that immediate review of the Commission's finding would serve neither underlying interest of the finality requirement. The Commission has indicated that it will soon institute proceedings to provide a mode of distribution consistent with its new policy in this area. Thus, "(o)ur review of the challenged action would interfere with an ongoing administrative process." Bethlehem Steel Corporation v. EPA, 536 F.2d 156, 161 (7th Cir. 1976).[18] We find no justification for this interference. As we have noted, they presently enjoy the protection of the current formula and will continue to enjoy that protection until the Commission has finally determined the appropriate mode of traffic distribution. We have no reason to believe that the IRCs will suffer from a prolonged state of uncertainty.[19] Instead, the Commission has clearly indicated its determination to reach a speedy resolution of the formula issues. See Formula, 75 F.C.C.2d at 371. Review at this juncture would, therefore, fail to "accord ( ) proper deference to the role of the agency in the administrative scheme...." Western Union International, Inc. v. FCC, 652 F.2d 136 at 143 (D.C.Cir.1980).
 
 
 45
 Similarly, immediate review would disserve the interest in "the efficient utilization of judicial resources." Id. In its contemplated proceedings, the Commission will establish a formula on the basis of its assessment of the relative interests involved and the information developed in the actual operation of new market conditions. This determination of the appropriate method of distribution will necessarily require the Commission to resolve the issue of its authority under section 222(e) to replace a "prescribed" formula with one premised on intercarrier contracts. The IRCs will thus have another opportunity to offer the interpretations of the restrictions imposed by section 222(e) which they presently urge in this court.
 
 
 46
 It may well be that these proceedings will afford the IRCs the relief they seek. The Commission could determine that section 222(e) does not authorize the contractual arrangements the Commission now contemplates. Similarly, the Commission may prescribe a new formula with which the IRCs are satisfied. The IRCs might then determine that they no longer desire further action by this court. On the other hand, if the IRCs obtain no relief from the Commission's ultimate prescription, they may then seek judicial review. Moreover, review at that time would be aided by a full record developed in the Commission's proceeding. The court would have before it the market data and further comments upon which the Commission bases its prescription, the Commission's interpretation and discussion of the relevant limitations imposed by section 222(e), and, if the Commission finally rejects the current formula, a more detailed explanation of that action.
 
 
 47
 Our review of the Commission's finding at this time would advance neither of the interests underlying the finality requirement. Moreover, deferral of that review imposes no injury upon the IRCs. We therefore conclude that the petitions of the IRCs are presently premature.
 
 III. CONCLUSION
 
 48
 In an attempt to promote its statutory goals, the Commission has recently taken several steps to create a market structure more nearly reflecting current market realities. While we recognize that these steps have necessarily introduced further uncertainty and awkwardness into the carriers' interrelationships, we find nothing in the petitions before us which requires our present intervention. The Commission has expressly acknowledged that WU's altered status necessitates concomitant regulatory change. It has, therefore, taken action to remove many of WU's unique regulatory burdens, and promises further action in that direction. Similarly, while the Commission has determined that the current formula and the formula's role require redefinition, it has made no final disposition of the matter. As we stated in Part II B, we find no present justification for interfering with the Commission's completion of its task. The petitions filed by the international record carriers are therefore dismissed as premature. The Commission's actions regarding Western Union Telegraph Company on review in these cases are affirmed.
 
 
 49
 It is so ordered.
 
 
 
 [1]
 Inbound international messages are those communications transmitted from a foreign telecommunications point to a destination in the continental United States. Prior to a recent Commission decision, International Record Carriers' Scope of Operations in the Continental United States, 76 F.C.C.2d 115 (1980) (hereinafter Gateways), appeal docketed, Western Union Telegraph Co. v. FCC, No. 79-2494 (D.C.Cir. Dec. 14, 1979), if that point was one of five "gateway" cities, the IRCs could deliver that communication directly. If, however, that point was located without the gateways, i.e., in the "hinterland," transmission required, in addition, the services of a domestic carrier. That carrier was always Western Union (WU). See Western Union Int'l, Inc. v. FCC, 652 F.2d 136 at 138-139 (D.C.Cir.1980)
 
 
 [2]
 Graphnet's certification at that time was limited to those who subscribed to its offerings. These restrictions recognized WU's status as the sole domestic public telegraph carrier
 
 
 [3]
 The Commission rejected WU's attempt to attribute its "ever-increasing telegraph rates, diseconomic subsidies for more vigorous services, and increasing volume declines," 67 F.C.C.2d at 510, to a moribund market and the need to provide the public with a last-resort service. It noted that the existence of potential entrants and the availability of services and networks permitting transmission prices well below current WU telegraph rates indicated at least the possibility of profit in the market. Id. at 509, 514. The Commission also observed that the public had clearly manifested its ability to utilize more efficient substitute services and pointed out that traditional public message telegraph service (PMTS) has no intrinsic value. Id. at 515
 
 
 [4]
 The Commission stated that by authorizing multiple entry it was removing a "substantial legal barrier" to Graphnet's application and explained in some detail why this authorization rendered inapplicable its previous objections to Graphnet's application under the "Free Direct Access" policies. 71 F.C.C.2d at 525-27. See Int'l Record Carriers' Scope of Operations in the Continental United States, 40 F.C.C.2d 1082 (1973) (hereinafter Free Direct Access or FDA ) and text at 1118-1120 infra. The Commission then observed that because these policy issues had been resolved there was no further reason to hold the hearing previously designated in the PMS Notice. 71 F.C.C.2d at 525 n.53
 
 
 [5]
 The international formula is the method which governs the distribution of outbound international message traffic among the international record carriers (IRCs)
 
 
 [6]
 In making this observation, the Commission referred specifically to its decision in Gateways. Formula, 75 F.C.C.2d at 362. The Commission also noted, however, that it had on that same day adopted seven other decisions "which affect in differing degrees the provision of international services by communications common carriers." Id. at 355. These decisions, it stated, "decrease the monetary importance of the formula and as major structural changes in the industry occur, they will affect the business relationships that have existed in the past between Western Union and the IRCs." Id. at 366
 
 
 [7]
 The Commission found that the percentage of routed messages had actually declined in the years following the implementation of the 1976 formula. 75 F.C.C.2d at 365
 
 
 [8]
 The Commission observed that under the current formula a carrier which lowers its prices will not benefit from a proportionate increase in its share of unrouted traffic for at least six months because distribution percentages are recalculated at six-month intervals. Id. at 366. In addition, this lag period might, in some circumstances, extend beyond six months. The Commission explained:
 If "routing" customers habitually use the same IRC (for reasons of loyalty or ignorance of lower rates from other carriers), these "routing" customers will force the distribution of unrouted traffic in an inefficient manner. Therefore, should any non-price or quality consideration lead some customers to route their message to an IRC which is not offering PMS service at the lowest price, a similar percentage of unrouted traffic will necessarily be awarded to that carrier. That is, some customers who do not route their messages will be forced to pay an unnecessarily high price because of the operation of the formula.
 Id. at 367.
 
 
 [9]
 Section 222(e)(1) provides that "the consolidated or merged carrier ... shall distribute among the international telegraph carriers (outbound traffic) ... in accordance with such just, reasonable, and equitable formula in the public interest ...." 47 U.S.C. § 222(e)(1) (1976) (emphasis added)
 
 
 [10]
 WU also appears to challenge as inconsistent the Commission's consideration of FDA 's applicability to Graphnet's situation. It observes that, in the Commission's rejection of Graphnet's tariff revisions, it declared the free direct access issue too important to be decided "as an ancillary matter," Graphnet Systems, Inc., On Petition for Reconsideration, 67 F.C.C.2d 1043, 1045 (1978), and notes the Commission's statement in its PMS Notice that the "full context and implication of that (FDA ) issue will be resolved in another proceeding...." PMS Notice, 67 F.C.C.2d at 1070-71. We believe WU attaches undue importance to these alleged inconsistencies. What the Commission actually stated in Graphnet Systems, Inc., supra, was that the free direct access issue should be addressed directly, "and not as an ancillary matter in a tariff proceeding." 67 F.C.C.2d at 1045 (emphasis added). While the Commission did discuss FDA 's applicability to Graphnet in PMS, it did not undertake to revisit the free direct access issue in that decision. Moreover, it explained that its discussion was required by its public interest findings regarding multiple entry. The Commission stated that it would be inconsistent with these findings "to preserve a Western Union monopoly over one segment of PMTS, hinterland pickup and delivery of messages from the IRC's gateways ...." PMS, 71 F.C.C.2d at 526
 
 
 [11]
 In FDA, the Commission rejected tariff filings by the IRCs proposing a free direct access service for hinterland customers. Such customers could obtain direct access to the desired IRC office, thus avoiding WU, by means of various communications media. Under the IRCs' proposal, however, payment for this customer usage of these media would be made by the IRCs rather than by the customers. Consequently, the Commission concluded, "acceptance and delivery of international messages will no longer occur at the IRC's gateway offices, but will shift to the point in the hinterland where the customer is located." 40 F.C.C.2d at 1086. This elimination of the distinction between gateway and hinterland could not be achieved, as the IRCs proposed, through tariff filings. Instead, the Commission stated, the IRCs must file an application for appropriate authorization. Id. at 1087
 
 
 [12]
 The Commission observes that WU's first demands for equal regulatory treatment were limited to the issues of speed of service standards and procedures for office conversions and closings. Brief for Respondent at 28. As the Commission points out, id. at 29, and as WU acknowledges, Brief for Petitioner WU at 23 n.19, relief from these requirements was supplied in the Formula order. See Formula, 75 F.C.C.2d at 374-77
 
 
 [13]
 Section 4(j) of the Federal Communications Act provides: "The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j) (1976). The Supreme Court has observed that by enacting this section Congress delegated to the Commission "the authority to resolve 'subordinate questions of procedure ... (such as) the scope of the inquiry ....' " FCC v. Schreiber, 381 U.S. 279, 289, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965), citing FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). See also Nader v. FCC, 520 F.2d 182, 195 (D.C.Cir.1975) ("(T)his court has upheld in the strongest terms the discretion of regulating agencies to control the disposition of their caseload.")
 
 
 [14]
 WU complains that "(t)here is no fixed deadline for the staff recommendation. Given the IRCs' recalcitrant stance and the FCC's demonstrated inability to decide cases within a reasonable time frame, ... the present formula ... is likely to remain in effect for an extended period ...." Brief for Petitioner WU at 24 (footnote omitted). We presently have no reason to believe that the Commission will unduly delay its resolution of the formula issues. Its discussion in Formula, in fact, clearly suggests the contrary. 75 F.C.C.2d at 371
 
 
 [15]
 WU's initial complaints regarding the formula centered on the fact that the formula prevented it from making the type of allocation arrangements reached between Graphnet and the IRCs. See Reply of the Western Union Telegraph Company with Respect to the Amended Application at 7; Joint Appendix at 152. Only later did WU challenge the formula itself as an impediment to fair competition. See Brief for Petitioner WU at 18-19, 22a-24. As indicated, WU's initial concern has been satisfied
 
 
 [16]
 The IRCs also challenge as coercive the Commission's order to negotiate. We believe that in light of the Commission's order, Regulatory Policies Concerning the Provision of Domestic Public Message Services by Entities Other than the Western Union Telegraph Co. (Memorandum Opinion and Order rejecting proposed agreements between WU and TRT Telecommunications Corporation and WU and FTC Communications), FCC 81-29 (Feb. 5, 1981), this challenge is moot. In its order the Commission stated its belief that the Second Circuit's decision in ITT World Communications, Inc. v. FCC, 635 F.2d 32 (2d Cir. 1980), precluded its approval of the bilateral intercarrier agreements it had encouraged in Formula. The Commission noted that "the Court has interpreted Section 222(e) to require Western Union to distribute overseas traffic among the various IRCs according to a formula approved by the Commission, rather than through a preferential relationship with any single IRC." Order, FCC 81-29, at 7. The IRCs express no disagreement with the concept of multilateral negotiations. See, e.g., Brief for Petitioner/Intervenor RCA Global Communications, Inc., at 55-58
 
 
 [17]
 We note that this court is authorized to review only "final orders of the Federal Communications Commission ...." 28 U.S.C. § 2342(1) (1976) (emphasis added)
 
 
 [18]
 In Bethlehem Steel, petitioners challenged air quality maintenance regulations and the designation by EPA of certain areas in Indiana as air quality maintenance areas. Although the court agreed that the issues raised by petitioners were "purely legal," it concluded that these issues were not fit for judicial review because "the actions challenged are part of a continuing agency decision-making process which has not yet resulted in an order requiring compliance by the petitioners." 536 F.2d at 161. We believe that this reasoning is relevant to the petitions of the IRCs. Although, as they point out, the issues appear to be purely legal, the Commission's finding is part of an "ongoing administrative process," 536 F.2d at 164, which does not presently impact upon the IRCs. For this reason we conclude, like the Seventh Circuit, that these issues are not fit for judicial review
 
 
 [19]
 Although some IRCs, like the steel and power companies in Bethlehem Steel, claim that the Commission's finding creates uncertainty in their business planning, they provide no support for their claim. We do not believe that a conclusory allegation is sufficient to invoke our review. See Bethlehem Steel at 162-63